THE PEOPLE OF THE STATE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH PLESHKO, Defendant-Appellant.

First District (5th Division)   No. 81—2631

Opinion filed December 23, 1983.

Steven Clark and Donna Finch, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Richard B. Levy, and Harry John Devereux, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was found guilty of burglary and

received a prison term of four years. (Ill. Rev. Stat. 1981, ch. 38, par. 19—1.) On appeal he contends that: (1) the trial court admitted evidence of unrelated criminal activity; (2) defense counsel incompetently failed to object to the admission of said unrelated crimes and lacked knowledge of the basic concepts of criminal procedure; (3) the evidence did not establish guilt beyond a reasonable doubt; (4) the prosecutor improperly commented on defendant's failure to testify; and (5) the trial court failed to give the proper jury instruction on circumstantial evidence. We affirm.

Initially, we note that nearly half the record on appeal is devoted to extensive pretrial proceedings which address defendant's motions and arguments thereon. Because defendant contends, for the most part, that his privately retained counsel provided inadequate legal representation, we will set forth the pertinent facts of the pretrial hearings before discussing the merits of this cause.

The record reveals the defendant and codefendant Rick Moutrey were arrested in Chicago at approximately 9:15 p.m. on August 6, 1980, while they were conversing with friends in the vicinity of Hamlin and Wellington Streets. Both men were subsequently charged with one count of burglary. Prior to trial, on April 1, 1981, a hearing was held on defendant's motions to quash his arrest, to suppress his post-arrest statement and for a separate trial

First, defendant argued that his arrest was unlawful because he was unaware that a warrant was outstanding at the time and because the arresting officer, James Gillespie, neither had a warrant nor reasonable grounds to take defendant into custody. In rebuttal, Gillespie testified for the State that while on patrol he received a radio assignment that a man who was wanted on a burglary warrant was in the 2900 block of Hamlin Street. Gillespie stated that he and his partner, James Bart, proceeded to that area in their squad car and upon arrival they saw defendant and others standing near a parked motorcycle. Gillespie asked for identification and was promptly shown everyone's drivers licenses. He then handcuffed defendant, informed him that he was under arrest and took him to the fourteenth district police station. After checking the police computer Gillespie discovered three arrest warrants under defendant's name.

On cross-examination, Gillespie stated that defendant was neither shown nor read an arrest warrant and that he had not seen defendant at any time prior to the day of the arrest.

The State next called investigator Thomas Spanos who testified that on March 6, 1980, he talked to Roberta McColm in her apartment which was located in the 2900 block of North Hamlin Street.

Also present were the burglary victims, Martha Latka, and her daughter. Spanos stated that McColm admitted that she had received some of Latka's property from defendant. McColm then showed Spanos a strobe light which Latka acknowledged was hers.

Following defendant's objection to a question to Spanos about his further investigation of this case, a side-bar conversation ensued where the State explained that it sought to prove that a warrant had been issued for defendant's arrest. Defense counsel stressed that the arrest was improper because he had never seen such document and if one existed defendant should have been given a copy. The State countered that although the arresting officer did not have the warrant with him, one had in fact been issued on March 20, 1980, for the burglary which occurred on March 3. The State offered to stipulate that defendant was not shown the warrant, but defense counsel interrupted and said he intended to show that there was no probable cause for the arrest in the first place.

Still testifying for the State, Spanos said that during his investigation of the burglary he spoke with Wesley Frauen on March 6, 1980. Frauen had not been placed under arrest but was brought to the station to be questioned. Frauen stated that on March 3 he rented his car to defendant and Moutrey for $25. Spanos testified further that Latka's neighbor had informed her that a vehicle (which matched the one that defendant and Moutrey had rented) was parked behind Latka's house and that someone got out of the car and went into the yard. Another neighbor told Latka that she recognized the car and knew who owned it. The owner turned out to be Wesley Frauen.

Testifying further, Spanos stated that he conferred with State's Attorneys and later secured a warrant for defendant's arrest.

Spanos was then impeached on cross-examination when he admitted that he had testified at defendant's preliminary hearing that he was the one who arrested defendant but that he had also testified before the court in the instant matter that another officer had in fact arrested defendant. After eliciting further testimony from Spanos that neither Frauen's nor defendant's brother's statements were the sole basis for the investigation of this case, defendant rested.

Defendant then argued that the testimony of Officers Gillespie and Spanos revealed a discrepancy as to who arrested defendant and that a question remained as to why Gillespie had failed to obtain a copy of the warrant. Defendant urged that this arrest was unlawful because he was forced to rely on Gillespie's "word of mouth" that a warrant existed and because the State failed to show how Gillespie knew, other than by a radio call, that a warrant had been issued. The

State countered that it would rely on the court's ability "to apply the law to the facts."

Denying defendant's motion to quash his arrest, the court reasoned that Gillespie's testimony that he received radio information that a warrant existed and that he was the officer who physically took defendant into custody was unrefuted. Moreover, the court ruled, case law is replete with authority that while an arresting officer must have reasonable grounds to believe that a warrant existed, he need not have the warrant itself in his possession. Also, probable cause to arrest was properly based on the statements of Wesley Frauen, defendant's brother, the observations of the burglary victim's neighbors and the officer's view of the stolen strobe light which Latka identified and which Roberta McColm said defendant gave to her.

Concerning Spanos' testimony that he was the one who arrested defendant, the court explained that Gillespie brought defendant to the police station and that shortly thereafter Spanos spoke with defendant. Whether Spanos believed he was placing defendant under arrest or not was unimportant, the court reasoned, since the arrest was made when defendant was taken into custody by an officer who had reasonable grounds to believe that a warrant existed.

Defendant's motion to suppress his post-arrest statements was addressed next. Officer Gillespie testified for the State that following the arrest he informed defendant of his *Miranda* rights and that defendant responded that he understood them. Defendant was then taken to the fourteenth district police station and placed in a lockup cell.

On cross-examination Gillespie reiterated the above facts and further stated that he did not know whether defendant was subsequently interrogated at the police station.

Detective Daniel Kepp next testified for the State that he and Detective Baraniak were present when Spanos showed defendant a waiver of rights form. Kepp said that Spanos asked defendant a series of questions which he (Spanos) typed as well as the answers defendant provided. Upon completion, defendant read the statement, made corrections and signed his name. Testifying further, Kepp stated that defendant was not promised leniency nor was he told that if he cooperated the police would help to get his bail lowered and that he would be given probation.

Under cross-examination Kepp stated that the question and answer session with Spanos proceeded uninterruptedly and that four people were present: defendant, Kepp and Detectives Spanos and Baraniak.

The State next called Spanos who testified that prior to questioning he informed defendant of his *Miranda* rights, that defendant acknowledged that he understood them, signed a rights waiver form and agreed to give a written statement. Detectives Baraniak and Kepp were present but did not ask any questions. After giving a statement, defendant signed it in Spanos' presence. Shortly thereafter defendant's father arrived.

Cross-examination of Spanos disclosed that defendant was interrogated for approximately one hour. At the close of Spanos' testimony the court received the State's exhibit of defendant's statement into evidence.

In rebuttal, defendant examined his brother, Walter Peter Pleshko, who testified that because Spanos threatened him with being charged as an accessory and said that Ms. Latka had threatened to have defendant murdered, he falsely told Spanos that defendant admitted to him that he (defendant) was involved in the burglary. After defendant was arrested he called his brother, who brought their father to the police station. Walter Peter Pleshko testified further that at the station Spanos said that defendant had been very cooperative and was not in trouble because he was so helpful and that he guaranteed that defendant would only receive a probationary sentence. Under cross-examination, Walter Peter Pleshko said that defendant had *not* admitted that he participated in the burglary although defendant had suggested that some of his friends may have been involved.

Defendant's father, Walter Peter Pleshko, Sr., was then called to testify. He said that he visited defendant at the police station and that he spoke to Spanos who stated that defendant had been cooperative.

Defendant testified next. He stated that after he was placed in custody at the station for approximately 1½ hours Spanos introduced himself, took defendant to a room and told defendant that if he would cooperate he would not go to jail, that Spanos would help to get defendant released and would get his bond lowered. Defendant stated that he was cooperative, answered questions and gave a statement because he was afraid. He read only parts of his statement and said that Spanos made certain corrections which defendant initialed. Defendant also testified that he completely obeyed Spanos' instructions, and was assured that he would only get a probationary sentence.

Under cross-examination defendant said that he admitted to Spanos that he knew about the burglary and had truthfully answered Spanos' questions. Defendant signed his statement after Spanos read it to him but did not bother to read it because he "already knew what it was." Testifying further, defendant said that Spanos failed to in-

clude in the statement that defendant answered his questions because of the promises of leniency that were made. Under redirect and re-cross-examination defendant testified that Spanos made certain promises before he informed defendant of his *Miranda* rights and that he failed to include all of defendant's answers in the statement because Spanos said it "would be better for me [defendant]."

During closing arguments on defendant's motion to suppress the State urged that the facts fail to support defendant's contention that Spanos made promises to defendant before he signed his statement; rather, there was a great deal of clear and convincing evidence that defendant was involved in the burglary. The State then set forth its version of the facts beginning with defendant's arrest and concluded that it had met its burden of proof that defendant's statement was made freely and without coercion.

Defendant argued that Spanos' promises were made prior to his statement and before any *Miranda* warnings were given and that they were a detective strategy to obtain incriminating evidence. Additionally, defendant contended, there was no physical evidence such as a radio dispatch sheet to corroborate Gillespie's testimony that he received a message to arrest defendant. Moreover, defendant said, the police in this case resorted to indiscriminate tactics, trickery and undue influence to solve the burglary as quickly as possible. Defendant concluded that "[t]his is what they call good police work, which deprives people who are in the lower financial bracket, to fillup the jails, and being incarcerated by this type of police work."

Defendant's motion to suppress his statement was denied. The court concluded that defendant was advised of his *Miranda* rights following his arrest and that it was unlikely that after being in custody at the police station for approximately an hour and 45 minutes defendant's resistance was shaken and he involuntarily gave a statement. Further, the court stated, although representation regarding defendant's bail may have been made to him, defendant's father testified that defendant told him at the police station that he was being cooperative. That testimony was fairly consistent with what the officers said and indicates that defendant's statement was probably made *prior* to his father's arrival and was not induced by anything other than an expectation on defendant's part that his cooperation would be instrumental in his release.

The subsequent pretrial proceedings addressed codefendant Moutrey's written motion and defendant's oral motion for severance, which were denied. The court ruled that because two trials would proceed simultaneously—a jury trial for defendant and a bench trial for

Moutrey—no testimony concerning a confession or other statements allegedly made by Moutrey which implicated defendant could be elicited from the witness stand while the jury was in the courtroom. If Moutrey testified, however, the State would be permitted to question him about his confession.

## THE TRIAL

The trial in this matter commenced August 28, 1981. The State's first witness, Martha Latka, testified that on March 3, 1980, at 6:15 a.m. she left her home to go to work and returned that evening at approximately 4:15 p.m. Upon entering, she saw that the dining room window was open and that the house was in disarray. Clothes were on top of dresser drawers, mattresses were overturned, her jewelry box was broken and gold jewelry and watches were missing along with two mink coats, a microwave oven, three televisions and a clock radio. She called the police and Spanos and his partner arrived. Three days later, Latka visited Roberta McColm's home and noticed that McColm had a strobe light that Latka believed had been stolen from her daughter's bedroom during the burglary. Later, in September 1980, Latka visited jewelry stores and recognized that her jewelry was being sold. Latka testified further that she had met defendant in 1979 when he came to her house to work on her daughter's car.

Next, Roberta McColm testified that she had known defendant for approximately five years and that on March 3, 1980, at approximately 6 or 7 p.m. defendant and Moutrey came to her home carrying a noticeably large quantity of money. Moutrey had a strobe light which McColm recognized as the one that she had purchased as a Christmas present for Latka's daughter.

Thomas Spanos testified that on March 3, 1980, during his followup investigation of the burglary he interviewed Latka, who was crying and was hysterical. In response to a telephone call from Latka on March 6, Spanos visited McColm who gave him the strobe light.

Spanos also testified that on August 6, 1980, defendant was being held at the police station and that approximately 11 p.m. he read defendant his *Miranda* rights. Immediately thereafter Spanos gave defendant a printed form containing his constitutional rights which defendant read and signed. Defendant then indicated his willingness to give a statement concerning the burglary. Officers Kepp and Baraniak were present when the statement was made. Spanos then read into evidence defendant's written statement verbatim in its entirety.

Testifying further, Spanos related that defendant admitted that he had discussed burglarizing the Latka home with Moutrey and Frauen.

On cross-examination, Spanos denied telling defendant or any member of his family that defendant would receive probation and a lower bond for his cooperation. He also testified that defendant's brother and father did not arrive at the police station until *after* defendant's written statement had been completed. At the close of Spanos' testimony, the State rested.

Prior to defendant's case in chief, the State moved to have defendant's written statement admitted into evidence which defendant objected to on the grounds that the copy tendered to him did not have Spanos' signature and would therefore violate the rules of discovery. Defendant's motion was denied.

Next, defendant's father testified that he spoke with Spanos at the police station and that Spanos told him that defendant was cooperative and helpful and that he would get a lower bail for defendant and would see that defendant received probation. Mr. Pleshko also testified that before defendant had completed his statement, Spanos said that if defendant did not cooperate he (Spanos) would "go after him on the charge."

In rebuttal, the State called Spanos who stated that he had not made promises to defendant concerning probation nor did he tell defendant's father that he would "go after" his son if he did not cooperate. Additionally, Spanos testified that his conversation with the Pleshko family had occurred *after* defendant completed his statement. Defendant then rested his case.

Following closing arguments the jury returned a guilty verdict for burglary and the court entered its judgment. This appeal followed.

OPINION

Defendant first contends that he was denied a fair trial by the court's admission of his post-arrest statement which was read into evidence by Spanos under direct examination by the State. The statement consisted of a series of questions and answers, the objectional portion of which is as follows:

> "Question [Spanos]: Have you ever sold any stolen merchandise to Anthony Best?
>
> Answer [Defendant]: I did, yes, umpteen million snow blowers, car stereos, power tools, [and] mechanic tools that were taken from people's garages and cars.
> ***
> Question: Have you ever broken in any house other than the Latka house with Moutrey and Frauen?
>
> Answer: No.

Question: Earlier you stated you sold items to Tony Best that came from garages, is that correct?

Answer: Yes.

Question: How did you get these items from the garages in question?

Answer: Most of the time the door was open and other times we broke in.

Question: What areas did you commit these burglaries in?

Answer: Norridge. Up that way.

Question: Did Moutrey or Frown [Frauen] ever go to these garage burglaries with you?

Answer: Yes. Both of them."

■ Additionally, defendant argues that by failing to object to the foregoing testimony which referred to other unrelated criminal activity, his counsel provided ineffective legal assistance and further, that the court's failure to admonish the jury that the testimony was incompetent and not to be considered in determining defendant's guilt or innocence deprived him of a fair trial. We disagree.

■ First, we cannot consider the court's admission of the contested testimony under plain error principles because the record affirmatively shows overwhelming evidence that defendant was accountable for the criminal acts of his accomplices. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 141, 402 N.E.2d 238.) For example, in an earlier portion of defendant's statement which Spanos also read into evidence, defendant revealed that he had discussed burglarizing the Latka home with Moutrey and Frauen, that he and Moutrey sold the stolen items to jewelry stores and that defendant received $600 or $700 of the proceeds. Defendant's damaging admissions, along with McColm's testimony that defendant and Moutrey had a strobe light that she had previously given to Latka's daughter and that neighbors spotted the car that defendant and Moutrey had rented parked behind Latka's home is clear and convincing evidence of defendant's involvement in the criminal scheme.

■ Also, defendant's statement was admissible to show knowledge and common design in that he had participated in several garage burglaries and that he had knowledge of what Moutrey and Frauen would do with the information he gave them about the Latka home. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) The statement further indicates that defendant provided important information with the motive of realizing a profit from the sale of the stolen merchandise. *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 174, 387 N.E.2d 1284.

Counsel's failure to object to the questioned testimony can be considered a trial strategy. Counsel may have decided that the incriminating statement was not rendered any worse by the reference to other crimes and that rather than contest the contents of the statement counsel chose instead to focus on the method by which the statement was obtained. The record reveals that during Spanos' cross-examination counsel repeatedly queried as to the authenticity of the signatures on the statement, in what room at the police station the statement was obtained and whether defendant gave the statement in response to promises that he would receive a low bail and a probationary sentence.

Additionally, we note that the court, *sua sponte*, excised the reference to other crimes in the statement before it was tendered to the jury and instructed that the reason for the blank spaces was irrelevant to its deliberation and should not be considered in reaching a verdict. Thus, we conclude that neither the admission of the statement nor counsel's failure to object thereto deprived defendant of a fair trial.

Defendant next urges that he was prejudiced by his counsel's unfamiliarity with arrest procedures in that he submitted a motion to quash the arrest which alleged that the arrest was illegal because the arresting officer did not have a warrant with him at the time. Counsel explained to the court that the proper way to effectuate a legal arrest "was to give him [defendant] a copy of the warrant so that he can examine it, so that he can go to an attorney and see if it is proper *** But, to merely say, we got a warrant for your arrest, and you are under arrest, but we can't show you that warrant, to me, seems that that arrest in itself, should not be binding."

In Illinois, the oft-cited standard of competence to determine whether counsel was incompetent is actual incompetence which caused such substantial prejudice to the defendant that the outcome of the trial was probably changed. (*People v. Carlson* (1980), 79 Ill. 2d 564, 584-85, 404 N.E.2d 233; *People v. Goins* (1981), 103 Ill. App. 3d 596, 600, 431 N.E.2d 1069.) Also, counsel's competency must be measured by the totality of his conduct at trial. *People v. Brownstein* (1982), 105 Ill. App. 3d 459, 465, 434 N.E.2d 505.

Applying the above to the facts before us, our thorough review of the record reveals that although counsel erred in his contention that an arrest is invalid if the officer does not have a warrant with him, counsel demonstrated a vigorous and thorough defense from the inception to the conclusion of the trial. Counsel filed and argued timely pretrial motions and conducted a thorough cross-examina-

tion of each witness which resulted in Spanos' impeachment. At the close of the State's case counsel made a motion for a directed verdict and thereafter presented a valid closing argument. In our judgment, defendant's charges of incompetence are unsupported by the record. The fact that counsel unsuccessfully argued a motion to quash the arrest is, by itself, an insufficient reason to judge that defendant was substantially prejudiced.

■ We next consider defendant's contention that he was not proven guilty beyond a reasonable doubt. To sustain a conviction under accountability principles, the State must prove that defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense. This participation must have taken place either before or during the perpetration of the crime and must have been with a concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 724-25, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714; *People v. Ware* (1980), 82 Ill. App. 3d 297, 306, 402 N.E.2d 762.) Also, although mere presence at the scene of the crime or negative acquiescence in another's actions is ordinarily insufficient to establish legal accountability for the acts of another, one may nonetheless be held to aid and abet without actively participating in the overt act. *People v. Gray* (1980), 87 Ill. App. 3d 142, 147, 408 N.E.2d 1150, *cert. denied* (1981), 450 U.S. 1032, 68 L. Ed. 2d 228, 101 S. Ct. 1745.

■ In the case at bar, defendant admitted that he had been involved in the planning of the burglary and that he, Moutrey and Frauen had discussed committing the burglary but that they had decided to put off "ripping her house off." Defendant's statement further revealed that he provided information about the Latka home after Moutrey and Frauen bragged about successful home burglaries elsewhere but when they told him that they were going to "get her house today" defendant told them that they were "crazy." He waited for them at a nearby tavern and when they returned the car was completely filled with stolen merchandise. Later, at approximately 8:30 or 9 p.m., defendant and Moutrey proceeded to sell the stolen merchandise to jewelers. Defendant stated that Moutrey said, "You were right about the house," and gave defendant $600 or $700 cash.

Although defendant may not have physically participated in the burglary, by his own admission he specifically and intentionally planned to commit the offense, met with his accomplices immediately afterward, went with Moutrey to sell the stolen goods and shared in the proceeds. Moreover, he failed to neutralize the effect of his assist-

ance by either notifying the police or by any other act. A person may not be accountable for the conduct of another if *before* the commission of the offense he terminates his effort to promote or facilitate such commission *and* does one of the following: either wholly deprives his prior efforts of effectiveness in such commission or gives timely warning to the proper law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense. (Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c); *People v. Balls* (1981), 95 Ill. App. 3d 70, 75, 419 N.E.2d 571.) In the instant case, defendant did none of the above. We believe that the evidence presented was sufficient to show that (1) defendant solicited, aided and abetted Moutrey and Frauen in planning the burglary; (2) that his participation took place *before* the commission of the offense, and (3) that defendant had the concurrent, specific intent to promote or facilitate the burglary. (*People v. Bell* (1981), 96 Ill. App. 3d 857, 864, 421 N.E.2d 1351.) Accordingly, we find no reasonable doubt of defendant's guilt.

▮ Defendant's fourth contention on appeal can be addressed summarily. Defendant argues that during rebuttal closing argument, the prosecutor improperly commented on defendant's failure to testify in his own behalf. Defendant fails to recognize, however, that during *his* closing argument he offered reasons as to why he did not testify and thus invited the prosecutor's remarks. Counsel explained that:

"You're also probably—I took the liberty of not permitting Joe [defendant] to testify, and I'm sure that the Court in its instruction will tell you that you're not to make an inference one way or the other. However, rather than repeat and rehash and say the same thing over and over again, he pleaded not guilty. What more can a man do than that?"

The prosecutor responded in rebuttal argument in the following manner:

"Counsel also says that Joseph Pleshko did not testify because it would have just been repetitious of what you heard. Well, I submit to you, ladies and gentlemen, that is not the reason why Joseph Pleshko did not testify in this case because he's going to repeat what his father said. That very small thing occurred five months after the incident, he would have been repetitious of, that he's got nothing else to say."

▮ Defense counsel may not invoke a response from the prosecutor in closing argument and then claim that defendant was thereby prejudiced. (*People v. Smith* (1982), 111 App. 3d 895, 907, 444 N.E.2d 801.) Here, counsel brought defendant's failure to testify to the jury's attention and sought to explain it away. Clearly invited, the

prosecutor simply and briefly rebutted counsel's explanation. Defendant's argument on this issue is therefore without merit.

The final issue presented for our consideration is that the trial court erred by refusing defendant's jury instruction on proof because the evidence presented was solely circumstantial. Defendant argues that for this reason, the second paragraph of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.02 (2d ed. 1981) should have been given. We disagree.

IPI Criminal No. 3.02 reads as follows:

> "[1] Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [(the) (a)] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.
>
> [2] You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence."

The committee notes to this instruction provide that the second paragraph should be given only when the proof of guilt is *entirely* circumstantial. In the instant case, the trial court properly observed that there was direct evidence of defendant's guilt and, therefore, paragraph two would be deleted. We agree. The direct evidence here consists of defendant's written statement wherein he admitted that he, Moutrey and Frauen had planned to burglarize the Latka home. Such an admission has been held to constitute direct evidence of guilt. (*People v. Panus* (1979), 76 Ill. 2d 263, 273, 391 N.E.2d 376.) We therefore find no error in this regard.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.