THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WALTER MONTAGUE, Defendant-Appellant.

Fourth District No. 4—86—0048

Opinion filed October 31, 1986.

334

Daniel D. Yuhas, of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Linda Welge, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

On December 12, 1985, the defendant, Walter Montague, was convicted by a jury of murder. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) He was subsequently sentenced to the Illinois Department of Corrections for a period of 25 years. Defendant appeals the order of the circuit court. We affirm.

The defendant raises six issues for consideration on appeal: (1) whether the State properly complied with discovery procedures prior to trial; (2) whether he received effective assistance of counsel; (3) whether the trial court erred in allowing photographs to be taken to the jury room during deliberations; (4) whether the prosecutor made unfair prejudicial statements during closing argument; (5) whether the trial court properly admitted a statement of the victim as a dying declaration; and (6) whether the trial court improperly considered the fact that the defendant's conduct threatened serious harm as a statutory aggravating factor during sentencing.

On April 26, 1985, the defendant was charged by information in Sangamon County with four counts of murder in the shooting death of Robert E. Green. The incident occurred at Mac's Lounge in Springfield. At trial, the defendant maintained that he acted in self-defense. The victim, Green, was at Mac's Lounge with the defendant's former girlfriend, Barbara Chavis. Chavis had met the defendant while in high school and later began living with him. During the course of their relationship, the couple had two children. Subsequently, the couple separated but the defendant continued to see the children and provide financial support.

On Sunday, March 31, 1985, Chavis and Green, a man she had been dating, met in Decatur and drove to Springfield together. They arrived in Springfield at approximately 7 p.m. and proceeded directly to Mac's Lounge at 13th and Cook streets in Springfield. Chavis and Green sat at a table near the dance floor, which was slightly elevated from the rest of the lounge. The defendant arrived at Mac's at about 7:30 p.m. Upon arrival, he briefly stopped by the table to ask Chavis about their children.

The defendant returned to the table several times that evening. Chavis testified that the last time the defendant approached the table she and Green each had a drink in front of them and Green was smoking a cigarette with his left hand. The defendant allegedly walked to the table and said "mother fucker, you still not going to let me talk to her." Green then asked the defendant what he wanted to talk about. The defendant mentioned something regarding Easter, and Chavis stated that the next thing she knew, she saw the defendant fire a gun three times at Green. Chavis stated that the defendant was standing when he fired the weapon at Green, who was seated at the table beside her.

According to Chavis, before he was shot, Green had not made any type of movement whatsoever. After the shots were fired, Green fell out of his chair to the floor. Chavis grabbed the defendant by his hand and told him to stop. The defendant looked at Chavis and walked out of the lounge.

Chavis stated that, while at Mac's Lounge, she and Green each had three mixed alcoholic drinks and that they were not under the influence of alcohol. She further indicated that the defendant was aware of her relationship with Green and there was no indication that he harbored any ill will toward either Chavis or Green.

McArthur Frazier, the owner of Mac's Lounge, testified on behalf of the State. He stated that he was working on Sunday, March 31, 1985, and was present when the shooting occurred. Frazier stated that at one point during the course of the evening, the defendant left the tavern for approximately 15 minutes. Upon returning, Frazier noted the defendant walk up the steps to the area where Green and Chavis were seated. About 30 seconds later, Frazier heard a gunshot. He looked in the direction of the noise and saw the defendant fire a second and third shot toward Green. Frazier stated that after the first shot was fired, he looked in the area where Green was seated and noticed that Green's hands were on the table. Frazier did admit that immediately prior to the first shot being fired he did not know where Green's hands were located.

After Green fell to the floor, Frazier ran out of the building. The defendant walked out the door and Frazier returned inside. Frazier then looked out and saw the defendant on the sidewalk, and the defendant stopped and said, "I told you what I would do."

Herbert Edwards, the bartender at Mac's Lounge, also testified on behalf of the State. He estimated that he served three drinks each to Chavis and Green and served one drink to the defendant. After the first shot was fired, Edwards looked in the direction of the noise and

saw the defendant firing at Green with a .44-magnum revolver. As the defendant ran down the steps, Chavis grabbed him and said, "You shot him." The defendant then allegedly said, "Yeah, I shot him, and I'll go to jail." On cross-examination, however, Edwards admitted that the defendant's exhibit No. 1, a photocopy of his signed statement which was given to the police, did not include any reference to the defendant saying that he would go to jail for his actions.

Officer Donald Loftus arrived upon the scene at approximately 11 p.m. He found Green with two gunshots to his body. One gunshot wound was in the left wrist and one was in the chest-stomach area. Over defense objection, Officer Loftus testified that Green was alive when he arrived. He informed Green that he had been shot in the wrist and chest area and that the injuries appeared very serious. Officer Loftus asked Green who shot him and he said, "Slate." Chavis testified that the defendant was also known as "Slate." Loftus asked Green why the defendant had shot him and Green said that "he did not know."

Officers Jeff Backer and Sandra Smith arrested the defendant. They both testified that when they arrived at the defendant's home, he was on the front porch with his hands in the air. The defendant was asked where the gun was located, and he showed the officers the gun in the second drawer of a kitchen cabinet. Officer Backer identified the gun as a .44-magnum Smith and Wesson Model 29. The weapon was loaded when Officer Backer retrieved it. There was an empty shell casing underneath the hammer and there were two other empty shell casings to the left of that one. There were three live rounds of ammunition in the cylinder.

While the officers were at defendant's home, he received a telephone call, and the officers testified that they heard the defendant say he could not talk right then because he had "shot somebody and was in trouble." Officer Smith further testified that she heard the defendant tell the telephone caller, "I'm going to jail." A short time later, a friend of the defendant's arrived at his home and Officer Smith heard the defendant tell him, "I'm going down the river, I just shot somebody."

The State's final witness was pathologist Dr. William Nickey, who testified that the cause of Robert Green's death was bleeding to death from the gunshot wound to his chest. Dr. Nickey stated that Green had two gunshot wounds. One entered about the middle, upper abdomen and the other wound was at the back of the left wrist and to the medial side of the left wrist. Dr. Nickey identified People's exhibit No. 3 as a photograph of Robert Green. People's exhibit No. 4 was identi-

fied as a photograph of the wrist wound and People's exhibit No. 13 was a photograph of the front anterior surface of Green's body.

Dr. Nickey further testified that he performed blood-alcohol tests on Green's blood sample and determined that it contained .033% of ethyl alcohol. Dr. Nickey did state that there was a great deal of blood loss which could have altered the actual alcohol level but opined that Green may have been intoxicated.

The defense tendered the testimony of three police officers to rebut the testimony of the State and to substantiate the defendant's claim of self-defense. Detective Tommy Todd stated that he investigated the shooting scene and went to the hospital to receive some items of physical evidence. He took photographs at the scene and collected physical evidence there. He recovered some spent projectiles at the scene and some clothing belonging to Green, which had been removed from Green at the scene by emergency personnel.

At the emergency room of St. John's Hospital, Detective Todd received a pocketknife and some items of clothing. The knife was placed in the property locker at the Springfield police department, along with the clothing. Officer Todd admitted that he did not know to whom the clothing belonged. Although defense counsel made a request for the knife prior to trial, it was no longer with the rest of the property and could not be found. Todd stated that the knife had been found in the pocket of the pants collected from St. John's Hospital on the night of the shooting. He further stated that the defendant was not treated at St. John's Hospital.

The defendant testified that he went to Mac's Lounge on Sunday, March 31, 1985. Upon arrival, the defendant noticed Chavis sitting with a man he did not recognize immediately. The defendant approached the table where the two were sitting, he asked about the children, and then proceeded back downstairs to the bar. While at the bar, the defendant stated that he met Cella Wilson and invited her to sit upstairs with him. The defendant and Wilson talked for some time, had a drink, had their picture taken together, and danced.

The defendant stated that he approached Chavis on more than one occasion that particular evening. Approximately an hour later, Cella Wilson decided to leave the bar, and defendant claimed he walked her outside. He stated that he returned about 5 to 10 minutes later and used the telephone. He claimed he drank a beer while at the bar and then went back upstairs. At this time, the defendant approached Chavis at Green's table to ask Chavis about Easter presents for the children. Green allegedly said, "As many times as you've been down to this table, man why don't you just sit down." Defendant

stated that he sat down and began talking with Chavis.

Shortly after the defendant sat down and started talking to Chavis, Green slapped the table and said, "I think you had better leave the table."

The defendant stated that he proceeded to get up from the table, turned in Chavis' direction and told her that he would talk to her later. As he turned away from Chavis, he stated that he saw her reach in Green's direction. Green was getting up from the table, pushing Chavis away. Defendant stated that Green was going for his pocket. The defendant said he saw a gleam, a shiny object and thought that Green had a gun. The defendant claimed at this point he pulled his own gun and fired three times.

After shooting Green, the defendant stated that he went outside. He denied saying anything to Frazier other than he was sorry. Defendant further denied making the statement that he shot him and he would go to jail. He also denied telling Frazier, "I told you what I would do," and denied making a statement in the presence of the police that he had shot someone and was going down the river.

On cross-examination, the defendant admitted that the .44-magnum revolver was what he used to shoot Green. He also stated that when he fired his third shot at Green, Green was falling to the floor.

During the trial, the defense requested a recess to provide them an opportunity to present testimony from the nurse who removed the clothing from Green at St. John's Hospital. The defense counsel wished to present her testimony to establish that the knife had been removed from the clothing which belonged to Green. The court allowed time to present a subpoena, but the witness was never produced and no further motions regarding the knife or the witness were made by defense counsel.

During closing arguments, the State prosecutor made a comment regarding the crimes on the east side of Springfield and witnesses from the east side of Springfield. Defense counsel objected to the prejudicial nature of the statement. The court instructed the prosecutor to refrain from any further statements of a similar nature, but the judge did not admonish the jury regarding the comment.

At the sentencing hearing, prior to sentencing the defendant to 25 years' imprisonment, the trial court made the following findings in aggravation:

> "Among the factors which the statute considers as aggravating, I find three which apply. Namely, the defendant's conduct did cause as well as threaten serious harm and that the defendant had a prior—has a history of prior criminality, although for

misdemeanors."

The defendant first maintains that he was denied due process of law when the State did not produce for trial a knife found in the decedent's clothing.

On April 26, 1985, the trial court issued a pretrial discovery order which ordered the State to disclose to defendant's attorney "all matters pursuant to Supreme Court Rule 412" (87 Ill. 2d R. 412). The State immediately responded to the order, indicating that it would make available for inspection any tangible objects that it intended to use at trial. A police report filed by Detective Todd was tendered to the defense per the discovery order. It included an inventory of the deceased's personal belongings, one item being a small pocketknife with a blade approximately 3 inches long in the open position, which was found in the decedent's right front pants pocket.

On June 21, 1985, subsequent to retaining new counsel, the defendant filed a motion for discovery. This motion listed 71 specific discoverable matters, including reports, photographs, records, and tangible evidence such as guns or knives. The motion requested disclosure in writing and permission to inspect, copy, photograph, and have reasonable tests made.

At trial, Detective Todd testified on behalf of the defense that he was at St. John's Hospital on the night of the shooting and received some personal property from a nurse in the emergency ward. He stated that he found a pocketknife with a blade approximately 3 inches long in the front pants pocket. He did not know to whom the property belonged. Per procedure, Detective Todd booked the property at the Springfield police department. Todd stated that this was the last time he saw the knife. Todd testified that defense counsel had asked for the knife the day of trial but that he was not in a position to deliver the knife and, furthermore, did not know where the knife was. He stated that he had made inquiries and had discussions with the property officer about the knife prior to the day of trial but that he had not been able to determine the location of the knife. Over State objection, the court recessed to allow the defense an opportunity to contact the nurse in the emergency room. The nurse, however, was never produced to testify.

The defendant asserts that the knife, which was requested in the discovery motion of June 21, 1985, was necessary for the defendant to adequately present his self-defense claim and maintains that the failure of the State to produce the knife constitutes reversible error.

■ Supreme Court Rule 412(c) provides that the State has the duty to disclose to defense counsel all evidence which tends to negate

the guilt of the defendant, or which might be used in mitigation of punishment. (87 Ill. 2d R. 412(c).) The purpose underlying prosecutorial disclosure is to ensure that the defendant is not denied access to exculpatory, impeachment, or mitigation evidence which is in the possession of government. *In re Hatfield* (1979), 72 Ill. App. 3d 249, 390 N.E.2d 453.

The United States Supreme Court has developed and refined the test to be applied in determining whether there has been a violation of due process arising from the alleged suppression of evidence. (See *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392.) Under this test, a defendant alleging a denial of due process must show: (1) a suppression by the prosecution of evidence which actually exists and which is in control of the prosecutor, after requests for production are made by the defense; (2) the evidence is favorable to the defense; and (3) the evidence is material to the defendant's case. The Illinois courts have adopted and continue to apply this test. See, *e.g., People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104; *People v. Bivins* (1981), 97 Ill. App. 3d 386, 422 N.E.2d 1044.

Upon review, the court will look to the entire record to determine if rejected evidence could have reasonably affected the verdict. (*People v. Wolff* (1960), 19 Ill. 2d 318, 167 N.E.2d 197, *cert. denied* (1960), 364 U.S. 874, 5 L. Ed. 2d 96, 81 S. Ct. 119.) The court will not disturb a judgment where guilt has been shown beyond a reasonable doubt or where, upon the evidence, the jury could not have reached a different verdict.

In order to claim a denial of due process, the defense must make a specific request for the evidence sought. (*People v. Hope* (1981), 96 Ill. App. 3d 180, 420 N.E.2d 1171.) When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable. (*United States v. Agurs* (1976), 427 U.S. 97, 106, 49 L. Ed. 2d 342, 351, 96 S. Ct. 2392, 2398.) If, however, the defense makes a general request seeking "all *Brady* material" this gives the prosecution no better notice than if no request had been made. The timing of a request may also be determinative. Where defense counsel is aware of the existence of certain evidence and fails to make a specific request until the day of trial, there is no *Brady* violation. *People v. Peters* (1986), 144 Ill. App. 3d 310, 315, 494 N.E.2d 853, 857.

The mere fact that a piece of evidence is helpful to the

defendant does not mean that it is "favorable" in the constitutional sense. Evidence is "material" when, if omitted, there is a reasonable doubt which would not otherwise exist. (*United States v. Agurs* (1976), 427 U.S. 97, 112, 49 L. Ed. 2d 342, 354-55, 96 S. Ct. 2392, 2401-02.) The omission of evidence must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the evidence is considered, there is no justification for a new trial. *People v. Rios* (1986), 145 Ill. App. 3d 571, 495 N.E.2d 1103.

■ On June 21, 1985, the defense counsel filed a motion for discovery. Prior to this, the court had ordered the State to comply with Supreme Court Rule 412. In its motion for discovery, defense listed some 71 areas of evidence, one of which was "any guns or knives connected with the crime." The trial court did not rule on this motion and the defense never tendered a specific request for the knife mentioned in the police report. Defense counsel failed to specifically inquire about the knife until the day of trial. Defense counsel did not make any motions for the State to produce the knife. In this respect, the first prong of the *Brady* test was not complied with.

While the evidence of the knife was "favorable" to the defense, in that it substantiated the defendant's claim of self-defense, the evidence was not "material." There was sufficient testimony to inform the jury of the presence of the knife. Not only the defendant, but also Detective Todd testified to the existence of the knife. Armed with this testimony, the jury still returned a verdict of guilty. As such, there was no *Brady* violation.

■ The defendant next maintains that he received ineffective assistance of counsel at trial. In support of this argument, the defendant asserts that counsel failed to present chain-of-custody evidence and thoroughly question Detective Todd, which would have definitely established the victim was in possession of a knife thus substantiating the defendant's claim of self-defense.

A reviewing court will presume that counsel is competent, and this presumption will only be overcome by strong and convincing proof of incompetency. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061, *rehearing denied* (1985), 472 U.S. 1013, 86 L. Ed. 2d 730, 105 S. Ct. 2715; *People v. Sprouse* (1981), 94 Ill. App. 3d 665, 418 N.E.2d 1070.) Competency of counsel is to be judged from the facts and circumstances of each case when viewed from the entire record and not from a narrow focus upon isolated instances which occurred during the course of a trial. 94 Ill. App. 3d 665, 418 N.E.2d 1070.

■ In *Albanese*, the Illinois Supreme Court adopted the "reasonably effective assistance" standard announced by the Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, for showing ineffective assistance of counsel. *Strickland* proposes a two-part test. First, a defendant must establish acts or omissions on the part of counsel which were not the result of reasonably professional judgment. Second, the defendant must show that but for counsel's unprofessional errors the result of the proceedings would have been different. (See *Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064-65.) An error by counsel, even if professionally unreasonable, does not warrant setting aside a judgment of a criminal proceeding if the error did not have an affect on the judgment.

■ Defense counsel called Detective Todd, who established the presence of the knife. This testimony was corroborated by the defendant, who testified that he saw a gleaming, shiny object in the decedent's hand before he shot in self-defense. Counsel's failure to elicit more specific testimony regarding the chain of custody was not conduct which can be deemed reasonably unprofessional. Further, it is very unlikely that such testimony, if presented, would have resulted in a different jury verdict. Hence, the defendant did not receive ineffective assistance of counsel.

■ During the testimony of pathologist Dr. William Nickey, the State introduced a series of photographs into evidence. The photographs depicted the wounds the victim suffered and were employed during the testimony of the pathologist, who explained the cause of death. These photographs were admitted into evidence, and two of the pictures were given to the jury during deliberations. The defendant maintains this was an abuse of the trial court's discretion as the photos were particularly gruesome and highly prejudicial.

Initially, the defendant has waived this issue. In order to preserve an error for review, a defendant must object both at trial and in a written post-trial motion. (See *People v. Smith* (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347; *People v. Bailey* (1985), 132 Ill. App. 3d 399, 476 N.E.2d 1360.) While the defendant in this case did object when the court allowed the photographs to go to the jury room, this issue was not raised in the defendant's post-trial motion. As such, the issue is waived.

■ On the merits, the allowance of exhibits to be taken to the jury room is within the sound discretion of the trial court. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752; *People v. Canada* (1967),

81 Ill. App. 2d 220, 225 N.E.2d 639.) In making the determination, the trial court will balance the probative value against any prejudicial effect. Where photographs are relevant to establish any fact in issue, they will be admitted despite the fact that they may be cumulative to oral testimony or gruesome in nature. (See *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208, *modified* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279, *rehearing denied* (1971), 404 U.S. 875, 30 L. Ed. 2d 121, 92 S. Ct. 32; *People v. West* (1977), 54 Ill. App. 3d 903, 370 N.E.2d 265.) In the case at bar, the two photographs were admissible as tending to establish the cause of death, the use of force, the various wounds and locations of the wounds suffered by the deceased, and the manner in which they were inflicted. Moreover, the photographs corroborated and explained the pathologist's testimony. Each photograph showed a different aspect of the crime. The photographs were not particularly gruesome, merely showing the gunshot wound suffered by the decedent. It was well within the discretion of the trial court to allow these photographs to be taken to the jury room during deliberations.

■■■ The defendant's fourth allegation is that certain statements made by the prosecutor during closing argument were racially prejudical, thus depriving him of a fair trial. At the beginning of his closing argument, the prosecutor stated, "The State must take their witnesses where they find them," and, "Crimes on the east side of Springfield, Illinois, generally have witnesses from the east side."

The defendant maintains that these comments contained racial implications which could only serve to inflame the passions or arouse the prejudice of the jury, thus undermining the judicial process and depriving him of a fair trial.

Initially, the State maintains that this issue was not properly preserved for appeal purposes. Errors are not preserved by general allegations or by mere references to constitutional principles without relating them to any particular aspect of the trial proceeding. (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 396, 459 N.E.2d 1102, 1106.) The defendant's failure to specifically address the statements made in closing argument in his post-trial motion thus constitutes a waiver.

■■■ On the merits, the scope, substance, and style of closing argument is left to the discretion of the trial court, which is in a superior position to determine the real effect of any statement which might be considered prejudicial. (*People v. Watson* (1982), 103 Ill. App. 3d 992, 996, 431 N.E.2d 1350, 1354.) Statements which are based on the evidence or a legitimate inference therefrom do not tran-

scend the bounds of legitimate argument. 103 Ill. App. 3d 992, 431 N.E.2d 1350.

 Where a prosecutor makes vague statements which do not contain a direct slur against the defendant or his race, these statements are not prejudicial. (See, *e.g., People v. Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347, *cert. denied* (1984), 469 U.S. 984, 83 L. Ed. 2d 207, 105 S. Ct. 271, *rehearing denied* (1984), 469 U.S. 1077, 83 L. Ed. 2d 516, 105 S. Ct. 577; *People v. Gary* (1976), 42 Ill. App. 3d 357, 356 N.E.2d 135.) Vague allegations to a particular sector of a community do not constitute prejudicial racial statements. (See *United States ex rel. Kirk v. Petrelli* (N.D. Ill. 1971), 331 F. Supp. 792, *aff'd* (1974), 492 F. 2d 1245 (prosecutor's reference to the south side of Chicago during closing argument).) A statement will be deemed prejudicial when it serves no legitimate purpose and is made solely to inflame the jury. *People v. Tiller* (1982), 94 Ill. 2d 303, 321, 447 N.E.2d 174, 184, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.

 In the case at bar, the prosecutor's reference to witnesses from the east side of Springfield was vague and did not contain any direct racial slurs. The statement was a logical inference based upon the evidence presented during trial. As such, it was not so prejudicial so as to deprive the defendant of a fair trial.

 The defendant's fifth allegation concerns testimony admitted as a dying declaration. At trial, over defense objection, Officer Donald Loftus testified to a conversation he had with the victim, Green, as they awaited an ambulance. Loftus stated that Green had tried to stand and that he had to settle him back down onto the floor. Loftus testified that he told Green that he was seriously injured, but admitted on cross-examination that Green was never told or expressed any knowledge that he was dying. Loftus did state that he asked the decedent who had shot him and the decedent replied, "Slate" or "Slayton." Loftus then asked the decedent why he was shot, to which he replied, "I have no idea. I don't know."

The standard for judicial review of the admission of dying declarations is whether the record supports the trial court's factual determination. (*People v. Van Broughton* (1976), 35 Ill. App. 3d 619, 624, 342 N.E.2d 100, 103.) In order for a statement to qualify as a dying declaration, the statement must be made under the fixed belief and moral conviction of the person making it that his death is impending and certain to follow almost immediately. (*People v. Tilley* (1950), 406 Ill. 398, 403, 94 N.E.2d 328, 331, *aff'd* (1952), 411 Ill. 2d 473, 104 N.E.2d 499, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 641, 73 S. Ct. 23.)

The declarant's belief may be determined by anything said by him and also by facts and circumstances surrounding the making of the statement. *People v. Davis* (1981), 93 Ill. App. 3d 217, 231, 416 N.E.2d 1197, 1208.

■■ In the case at bar, there is no indication whatsoever that the victim was under the belief that death was impending. The only statements made were that "Slate" had shot him and that he had no reason to understand why. In fact, the victim was trying to leave the bar when police officers arrived and had to be told to settle down. Neither the victim nor the officers made any mention of death whatsoever. The only comment regarding the deceased's physical condition was that it was serious. In this respect, the statement made by the victim could not constitute a dying declaration. The trial court's admission of this statement, however, was harmless in light of the cumulative nature of this testimony.

■■ The defendant's final contention on appeal is that the trial court improperly considered that his conduct caused serious harm as an aggravating factor in imposing sentence. The defendant was convicted of murder, which carries a sentence of from 20 to 40 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1.) At the sentencing hearing, the judge took note of the presentence report, the evidence at trial, particularly the testimony of Barbara Chavis, the arguments of counsel, the defendant's statement, and the defendant's prior convictions. The judge specifically noted the defendant's prior misdemeanor convictions involving misuse of firearms.

As for statutory factors in mitigation and aggravation, the judge found that no mitigating factors applied. As for aggravating factors, the court took note of three, namely that the defendant had caused as well as threatened serious harm, that the defendant had a prior history of criminality which involved firearm misuse, and that it was necessary to deter both the defendant as well as society. The court then sentenced the defendant to 25 years' imprisonment, specifically noting and placing a great deal of emphasis upon a concern for general deterrence.

The State initially maintains that this argument has been waived. In the absence of plain error (*People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261), a nonjurisdictional question which was not presented in the trial court may not be presented for the first time upon review. (*People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353.) This rule has been applied to objections to sentencing procedures, and thus failure to object to a sentence or procedure during which it was imposed will constitute a waiver. (*People v. Nelson* (1975), 26 Ill. App.

3d 227, 229, 324 N.E.2d 719, 720.) In this case, the defendant did not object when the trial court made its finding that serious harm could be considered as a factor in aggravation. As such, this issue has been waived.

■■ On the merits, it is impermissible for the trial court to consider the end result of a defendant's actions in causing serious harm or death when that very factor is implicit in the offense. (*People v. Saldivar* (1986), 113 Ill. 2d 256.) It is, however, permissible for the trial court in applying the statutory aggravating factor that the defendant caused serious harm to consider the amount and type of force employed and the physical manner in which the victim's death was brought about. 113 Ill. 2d 256.

■■ The fact that a particular defendant carries a gun and shoots deliberately at point-blank range may be considered as an aggravating factor. (*People v. Hughes* (1982), 109 Ill. App. 3d 352, 440 N.E.2d 432, cited with approval in *People v. Saldivar* (1986), 113 Ill. 2d 256.) Here, the defendant carried a gun and deliberately fired three shots directly at Green, the victim. The defendant admitted that he fired the third shot as Green was falling off his chair onto the floor. In this respect, the gravity of the harm imposed and the physical manner in which death was brought about were properly considered as aggravating factors.

In *Saldivar*, the trial court found many mitigating factors; the only aggravating factor considered was that the defendant caused serious harm. Here, the trial court stressed the need for general deterrence and emphasized the defendant's prior convictions involving misuse of firearms as well as the aggravating factor of causing serious harm. The "serious harm" factor only received cursory attention. The court emphasized prior firearm misuse and the need for specific as well as general deterrence. Furthermore, the sentence imposed was only five years in excess of the minimum. As such, the trial court was justified in imposing this sentence and there was no abuse of discretion.

Affirmed.

WEBBER and GREEN, JJ., concur.