THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS SPEROW, Defendant-Appellant.

Fourth District    No. 4—87—0067

Opinion filed June 16, 1988.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

The defendant, Dennis E. Sperow, appeals his convictions for murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(1)), aggravated unlawful restraint (Ill. Rev. Stat. 1985, ch. 38, par. 10—3.1), and obstructing justice (Ill. Rev. Stat. 1985, ch. 38, par. 31—4(a)). In support of his appeal, the defendant claims: (1) he was denied due process of law where the State presented testimony of his convicted codefendant; (2) he was denied effective assistance of counsel where the court failed to appoint new counsel for post-trial proceedings; (3) the court considered an improper factor in aggravation at sentencing; and (4) his conviction for unlawful restraint was improper.

On July 2, 1986, the defendant was charged by information with four counts of murder, one count of aggravated battery, one count of aggravated unlawful restraint, and one count of obstructing justice. Codefendant Robert Watts was likewise charged. Watts was tried and convicted in a separate trial prior to the defendant's conviction. The charges were based upon an incident which allegedly occurred on June 10, 1986, resulting in the death of Linda Faye Robinson. The defendant's case proceeded to jury trial and on December 18, 1986, the defendant was convicted of the four offenses. On January 16, 1987, the defendant's post-trial motion was denied and defendant was sentenced to terms of 60 years for murder, five years for aggravated battery, four years for unlawful restraint, and one year for obstructing justice. The defendant filed a timely notice of appeal.

At trial, Robert Watts testified on behalf of the State. Watts had been previously convicted and sentenced for the same offenses. Watts was found guilty of these offenses based upon the theory of accountability. Watts admitted, however, that he had not been completely truthful when he testified at his own trial. Testimony indicated that the State granted Watts immunity from any perjury prosecution for any variances in his testimony during the defendant's trial. Watts further informed the court of a previous conviction for rape in November of 1986.

Watts, who had separated from his wife, was living in Springfield in the spring of 1986. His wife and their three daughters were living in Bloomington. As a result, Watts traveled to Bloomington on a regular basis to visit his daughters. On Mother's Day, in May of 1986, Watts was driving from Bloomington to Springfield when he picked up the defendant, who was hitchhiking. During the ride, the defendant asked Watts if he knew of a place where the defendant could stay. Watts told the defendant he could stay with him and his friend. The

defendant told Watts he was a roofer in search of employment.

The defendant remained with Watts thereafter, seeking work intermittently, but unsuccessfully. Watts explained that when he met the defendant, he was living with Joey Bilyeu, a co-worker. The men lived with Bilyeu for approximately two to three weeks. The two men then moved in with Jenny Cook, a friend of Watts. Watts admitted that he initially told Bilyeu that the defendant was his cousin.

On June 9, the night of the incident, Watts worked delivering pizzas from 4 p.m. until 11 p.m. After work, he went to Cook's apartment, where he found the defendant, Cook, and Tina Hulett drinking. The four ate dinner and continued to drink throughout the evening. At approximately 2:50 a.m., Watts and the defendant left the apartment to purchase more alcohol. They proceeded to Walt and Deanies, where they purchased liquor. As the two men were driving back towards Cook's apartment, the defendant told Watts he desired some female companionship. As a result, Watts drove to an area in town where prostitutes are known to frequent. As they drove through town, the defendant saw a woman in the shadows and told Watts to honk the horn. At this point, Robinson walked up to the car on the passenger side. The defendant rolled down the window and asked if she would take both of them. Robinson told the men that three was not a crowd and it would cost them $50. Robinson then instructed the defendant to slide over and entered the car through the passenger door. Watts said hello to Robinson, but did not indicate that he knew her. He asked her name, and Robinson appeared somewhat confused.

At this point in the testimony, Watts explained that he was already acquainted with Robinson. He first met her in the section of Springfield where prostitutes work early one morning in April of 1986. Watts explained he was delivering a pizza when Robinson approached his car and asked if he wanted a date. He took her to Bilyeu's apartment, where they had sex and Watts paid Robinson $20. Watts testified that he picked up Robinson on two subsequent occasions. Both times, he took her to Bilyeu's apartment and paid her for sex. Watts stated that he not only had sex with Robinson but also confided in her regarding his personal life and the status of his marriage. On cross-examination, Watts stated that he had not previously revealed his relationship with Robinson because he feared that it would strengthen the State's case against him.

After Robinson entered the vehicle, Watts drove in search of a secluded place where they could have sex. He stated that he drove out Clear Lake Road and turned off on Miller's Road, which eventually turned into a gravel path. As they approached the gravel path, the

defendant pulled a knife and placed it against Robinson's throat. Watts stated that he could not actually see the knife but told the defendant to "knock it off" and get rid of the knife. At this point, defendant rolled down the window and then slid into the backseat of the car. Watts believed the defendant had thrown the knife out of the window. As Watts continued driving, the defendant grabbed Robinson's arm and attempted to pull her into the backseat. At this point, Watts stopped the car.

Watts got out of the car and threatened to drive Robinson back to town. The defendant assured him that everything would be fine. The defendant exited the car and grabbed Robinson, tearing her blouse. Watts again told the defendant to leave the woman alone. At this point, Watts told Robinson that he did not have any money. The defendant also told her he could not pay. Watts claimed that he did not know the defendant was without money and additionally stated he believed the defendant had recently received a paycheck. Watts later testified that he told Robinson he would take care of the money at a later point in time.

Watts then began walking away from the car with Robinson. The two proceeded to a point approximately 35 feet west of the car. The defendant remained behind by the car drinking whiskey. Meanwhile, Watts and the woman had sex on the ground. Afterwards, Watts returned to the car and told the defendant it was his turn. The defendant went to the same spot where Watts and Robinson had been and proceeded to have sex with Robinson. Watts stayed at the car for a short time drinking whiskey. He then proceeded to the spot where defendant and Robinson were. According to Watts, the woman was on her hands and knees, and the defendant was having sex with her from behind. Watts went to the front of the woman and got in position for her to have oral sex with him. At this point, Watts stated he heard ripping and thumping sounds as the defendant stabbed Robinson a number of times. The woman was stabbed in the side and lower back. Watts claimed, however, that he never saw the knife. Robinson fell to the ground, and Watts believed she was dead. He then started to walk towards the car. As he proceeded, he heard a commotion and looked back to see Robinson running away from the defendant.

The defendant told Watts to stop the woman. Watts chased Robinson and eventually tackled her. The woman smacked him once and Watts grabbed her hands to hold her down. He then slapped her across the face. Robinson asked Watts not to let the defendant kill her. Watts told the woman he would go and get the knife from the defendant. As Watts was getting up from on top of the woman, the

defendant came "from out of nowhere with a great big object" and hit the woman on the head. Watts claimed he could tell she was already dead. Watts stood up as the defendant delivered additional blows to the woman's face. Watts admitted he made no attempt to stop the defendant. At this point, Watts left the scene. The defendant continued to hit the woman with the large object. As Watts walked across the railroad tracks toward the car, he heard several thumps.

Watts then went to his car and attempted to leave the area, but the defendant jumped in as he began to drive away. The defendant, who was covered with mud and blood, told Watts to take him to some water. Watts drove to Lake Springfield. The defendant immediately got out of the car and dove into the water. Watts claimed that as he walked on a pier, he stumbled, fell into the water and then waded out waist-deep. Watts stated that for some unknown reason, he took off his tennis shoes and threw them into the lake. He claimed he did not believe there was blood on his shoes.

After leaving the lake, Watts drove back toward Springfield. Along the way, Watts realized his T-shirt was missing. The defendant told Watts that he had used it to wipe some blood off the door and dashboard and had thrown it out the window. The men then went through a car wash and further cleaned out the car. The men then proceeded to Cook's house, where Watts washed their clothes. The defendant went upstairs and got into the bathtub. After the defendant had bathed, Watts went upstairs and rinsed in the defendant's bath water.

The defendant then began to mess with Cook and Hulett, at which point, Watts became more scared. Watts testified that he wanted to get the defendant away from the women. As a result, Watts and the defendant headed towards Bloomington, where Watts' family lives. However, while en route, Watts' car suffered a flat tire. The men flagged down a truck and convinced the driver to take them back to Springfield.

While the men were driving, Watts told the defendant he could not forget what had happened. The defendant replied that it would be best to forget it if Watts ever wanted to see his wife and children again. The defendant then laughed. He also told Watts that what had happened "was history."

Upon returning to Springfield, Watts and the defendant proceeded to Bilyeu's house. It was approximately 8 a.m. The defendant kept complaining that there was something in his eye. Watts stated the defendant had been injured during the incident. The two men borrowed Bilyeu's car and took her to a meeting at work. They then

tried to obtain a new tire for Watts' car. At approximately noon, the three went to Watts' car. They fixed the car and returned to Springfield. At this point, Watts dropped the defendant, who was still complaining about his injuries, at the hospital.

Watts next went to work, but left shortly thereafter to go speak with his stepfather, William Bunch. He knew his stepfather was acquainted with some police officers and wanted to report the crime. While at his stepfather's house, Watts told him that he had witnessed a murder, but did not supply any details. Bunch called Officer Scott Allin and then took Watts to Allin's house. Watts claimed that he had come forward because he was not a murderer and did not want to be a part of a pointless crime.

Upon arrival at Allin's home, Watts told Allin that he had witnessed a murder and could take him to the scene of the crime. Allin immediately called his supervisor and was informed that the Springfield police department had no knowledge of such an incident. Watts proceeded to direct Allin to the scene of the crime in the northeast section of Springfield. Upon arrival at the scene, Watts directed Allin to the approximate area where the body could be found. Allin went to that area and discovered the severely beaten, nude body of a deceased black female. He also observed a large piece of concrete with blood on it near the corpse. Allin immediately contacted the police department, informing them of the incident and requesting appropriate personnel be dispatched.

Watts remained at the scene for over an hour. He gave statements to three different police officers. Watts did not, however, tell the officers that he had been near Robinson when she was killed. He stated that he had been leaning on the car while the defendant had sex with Robinson and that Robinson had run away from the defendant. Following the defendant's orders, Watts chased Robinson and eventually tackled her. At this point, the woman told Watts she had been stabbed. Watts stated that he then proceeded back towards the car, when the defendant ran by carrying the piece of concrete. Watts claimed that he was in shock and confused, and did not realize he had lied to the officers at the scene of the incident.

Watts was subsequently taken to the Springfield police station from the scene of the crime. There, he was interviewed at length by Detective Castleman. Castleman then took Watts to Cook's apartment, where they recovered clothes from the washing machine. Watts' pants were found behind the washing machine. They also went to Watts' car, where they searched the interior.

Watts was next taken to the sheriff's office, where he was ques-

tioned further. The officers told Watts that there were contradictions with the evidence found and the story he had given. He consequently gave another statement which differed from the initial statements he made. This statement was tape-recorded. During the statement, Watts revealed that he had been straddling Robinson when the defendant administered the fatal blows. Watts attempted to explain the inconsistencies in his statements. He stated that he was confused, specifically because his pants were not found in the washing machine. He specifically feared that the defendant had planted an item of Robinson's in his pants to directly implicate him in the crime.

During cross-examination, the defense highlighted all inconsistent statements made by Watts. Watts admitted that each version of the incident which was told to the police had been slightly different. Watts said he lied at his trial. He admitted that he did not reveal his prior relationship with the woman and did not tell the police that he was straddling the woman when she was killed. Watts also conceded that he gave inconsistent statements regarding witnessing the initial stabbing. Watts testified that the State had assured his immunity from any potential perjury prosecution.

Leon Rule, the truck driver who picked up Watts and the defendant on the morning following the incident, testified on behalf of the State. He stated that he is employed as a truck driver and picked up the two men on I-55 southbound on June 10, 1986. Although it was company policy not to pick up hitchhikers, Rule picked the two men up because it was raining and their car had broken down. Rule stated that Watts was not wearing any shoes but only socks. The defendant kept rubbing his eye and told Rule that he had stuck something in his eye earlier that day. Rule stated that he let the two men off at the South Grand exit.

Jenny Cook, a friend of Watts, stated that the defendant and Watts were living with her at the time of the incident. On June 10, 1986, according to Cook, Watts had left for work at approximately 5 p.m. The defendant stayed behind at Cook's apartment, drinking beer and whiskey. Watts returned from work at approximately 11:15 and joined in the drinking. Cook's friend, Tina Hulett, was also present at this point in time. At approximately 2:45 a.m., the two men left, and Cook and Hulett retired for the evening. Cook stated that she heard the two men return to her house at approximately 6 a.m. Cook identified the knife that was found at the scene of the crime as one from her kitchen. She stated that the knife was in Watts' car. It was her belief that Watts had previously used the knife to open the trunk of the car. Cook finally admitted that she did not know if Watts and the

defendant were together between 3 a.m. and 6 a.m. on June 10, 1986.

Tina Hulett testified, largely corroborating the statement of Cook. Hulett indicated that she had known Watts for three years and believed Watts and Sperow were friends. Hulett further added that when she returned from work on the evening of June 10, she noticed what appeared to be a spot of blood on the stairway in Cook's apartment. Hulett claimed the spot had not been there before that point in time.

Dr. Grant Johnson, pathologist and coroner's physician for Sangamon County, testified that he examined the body of Linda Faye Robinson at the scene of the incident. Johnson observed several stab wounds to the body and noted severe damage to the woman's head. Johnson also observed a red substance on a piece of concrete found lying near the woman. He noted a seven-inch depression in the mud below the woman's head. Johnson, who later took part in the autopsy of the body along with Dr. John Dietrich, noted no defensive wounds on the woman's hands. Johnson revealed that the autopsy did indicate the presence of alcohol and drugs in the victim's system. He further testified that the piece of concrete found near the woman's head weighed 24 pounds. Johnson estimated the time of death to be between 2 a.m. and 6 a.m.

Dr. John Dietrich testified that the chest of Linda Faye Robinson exhibited five stab wounds. The head had sustained multiple crushing injuries. Dietrich believed that the concrete and the knife found near the body were, respectively, consistent with the head injuries and the stab wounds. The doctor further confirmed the presence of spermatozoa inside the victim. According to Dietrich, the body exhibited no signs of forceful sex, or any signs of forceful grabbing of the limbs or torso. It was Dietrich's opinion, based upon his examination of the body, that the cause of death was massive brain injury due to multiple skull fractures. Dietrich opined that the stab wounds which were inflicted were not lethal.

Kevin Horath, a forensic scientist specializing in latent fingerprints, testified on behalf of the State. Horath conducted tests on the knife found at the scene of the crime. Horath could not, however, find any latent prints on the knife.

Phillip Sallee, a forensic serologist with the State crime lab, testified about the various pieces of physical evidence recovered from the scene. According to Sallee, semen was present in the vagina and rectum of the victim. Sallee testified that the defendant's pants did not exhibit any sign of blood. Additionally, there was no blood found on the knife recovered from the scene of the crime. Blood was, however,

found on the large piece of concrete. The blood type on the piece of concrete was consistent with that of the victim. Sallee further indicated that there was one Caucasian hair recovered from the victim's sweatshirt. Sallee opined that this hair was consistent with that of the defendant. On cross-examination, Sallee explained the nature of his examination and admitted his conclusions were not 100% accurate.

Springfield police officers John Workman and William Sowers established that the body was that of Linda Faye "Ebony" Robinson. Workman stated that he had previously arrested and fingerprinted Robinson, and Sowers, an evidence technician, stated that the fingerprints on the body matched those of Robinson in the police file.

Joey Bilyeu, a co-worker and friend of Watts, testified that she met the defendant through Watts approximately one month before the incident. Bilyeu believed that Watts and the defendant were close friends as they did many things together. According to Bilyeu, the two men moved out of her home two weeks before the incident. She believed they moved into Jenny Cook's apartment. Bilyeu stated that on the morning of June 10, the two men came to her apartment, borrowed her car, and dropped her off at a manager's meeting at her place of employment. At approximately 12:30, the two returned and the three proceeded to Watts' car which had suffered a flat tire on I-55 near Lincoln, Illinois. They repaired the car and returned to Springfield. Upon return, Bilyeu and Watts dropped the defendant off at the hospital as he was complaining of an injury to his eye. On cross-examination, Bilyeu admitted that she was involved in a sexual relationship with Watts.

The State next presented police officers who described the scene of the incident and the evidence recovered therefrom. Evidence recovered included a large piece of cement which was located three feet west of the body, a wig, a shirt, a single tennis shoe, a knife, and a pair of pants. All of the evidence was taken to the sheriff's department and put into an evidence locker under the direct control of the sheriff's office. Testimony substantiated the chain of custody for the evidence recovered.

Officer Terry Castleman, who arrested the defendant, described the physical injuries of the defendant. Castleman stated upon arrest, the defendant had a patch over his eye, a scratch on his neck, and a gash in his head. He told Castleman that he had injured himself by running into a tree while jogging.

The final witness presented on behalf of the State was Gregory Webster, an inmate incarcerated at the Logan County jail. Webster stated that he had been convicted of involuntary manslaughter and

burglary and was awaiting sentencing. Webster stated he was previously incarcerated in the Sangamon County jail and the defendant had been his cell mate. Webster stated that while living with the defendant, the defendant spoke a great deal about his case. Although Webster could not remember the specific dates or number of times that the defendant spoke with him, he recounted the statements made by the defendant.

According to Webster, the defendant told him that he and Watts had picked up a hooker and did not have any money to pay her. The two men then drove to the outskirts of town where Watts raped the woman and then the defendant raped her. The defendant further told Webster that while he was raping her from behind he began to stab her. According to Webster, the defendant physically demonstrated how he had stabbed the woman. Next, the defendant told Webster that the woman tried to escape but Watts chased the woman and tackled her. The defendant then picked up a rock and dropped it on her head several times. The two men got into the car and drove to Lake Springfield, where they swam in the water to remove the blood from their clothes.

According to Webster, the defendant said he planned to tell the authorities a completely different story. He was going to tell the police that he was with Watts when they picked up the hooker, but immediately thereafter left the two alone and went jogging. On cross-examination, the defense extensively explored Webster's motive for testifying, that being, a reduction in his sentence. Webster further admitted he believed the defendant was charged with rape.

This was the sum of the State's testimony. The defendant did not present any evidence. Following deliberations, the jury returned verdicts of guilty for murder, aggravated battery, aggravated and unlawful restraint, and obstructing justice. The defendant's post-trial motion was denied and the defendant was subsequently sentenced to terms of 60, 5, and 4 years, and 1 year, respectively.

■■ ■ Initially, defendant claims a denial of due process and resultant unfair trial where the prosecutor portrayed Watts in a different light than he was portrayed during his own trial. According to the defendant, this inconsistent treatment of a witness is analogous to the knowing use of perjured testimony. Additionally, the defendant asserts that the State's alleged misrepresentation that Watts had "nothing to gain" by testifying constitutes reversible error. The State counters, asserting waiver of the issue.

We are constrained from addressing the merits of this issue as it was not properly preserved for our consideration. A constitutional

question may not be properly raised for the first time in a court of review, but must have been presented to the trial court and ruled upon by it. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 447, 508 N.E.2d 687, 695, *cert. denied* (1987), ___ U.S. ___, 98 L. Ed. 2d 266, 108 S. Ct. 307; *People v. Friesland* (1985), 109 Ill. 2d 369, 374, 488 N.E.2d 261, 262.) The failure to make a timely objection at trial in conjunction with the failure to include a specific issue in a post-trial motion renders the issue waived. *Whitehead*, 116 Ill. 2d at 447, 508 N.E.2d at 695; *Friesland*, 109 Ill. 2d at 374, 488 N.E.2d at 262.

The rationale underlying the concept of waiver is to ensure a fair, orderly, and expeditious administration of justice. (*Friesland*, 109 Ill. 2d at 378, 488 N.E.2d at 264.) When an issue is properly raised and preserved, the attention of the trial judge is focused upon those particular aspects of the proceeding with which the defendant is concerned, and further gives the reviewing court the benefit of the judgment of the trial court with reference thereto. *Friesland*, 109 Ill. 2d at 376, 488 N.E.2d at 263.

The defendant herein did not object to the testimony of Watts during trial. Nor did the defendant raise any objection to Watts' testimony in his post-trial motion. In fact, defense attorney engaged in extensive cross-examination to impeach the credibility of Watts by using his prior inconsistent statements. As a result, we deem the issue waived and see no need to address the merits.

Contrary to the defendant's assertions, this issue does not rise to the level of plain error as contemplated by Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)). Under the plain error doctrine, a reviewing court may circumvent the waiver rule and elect to address an issue where the evidence was closely balanced or where it is plainly apparent from the record that the error was of such magnitude that the accused was denied a fair trial. (*Whitehead*, 116 Ill. 2d at 448, 508 N.E.2d at 695; *Friesland*, 109 Ill. 2d at 375-76, 488 N.E.2d at 263.) Rule 615(a) is thus limited in application and does not operate in the nature of a general saving clause. *Friesland*, 109 Ill. 2d at 375, 488 N.E.2d at 263.

Based on our extensive review of the record presented herein, we cannot say that the evidence was closely balanced. In addition to the testimony of codefendant Watts, there was physical evidence, as well as admissions made by the defendant which were admitted during trial. Moreover, we conclude that the error alleged by the defendant was not of such magnitude as to call into question the fairness of the defendant's trial. The defense conducted an extensive cross-examination of Watts. The jury was made aware of Watts' inconsistent state-

ments. As a result, any alleged prosecutorial misconduct does not rise to the level of plain error.

■■ The defendant's second contention on appeal assigns error to the trial court's failure to appoint substitute counsel for post-trial proceedings. Defendant requests that his cause be remanded for further post-trial hearings, during which he is represented by new counsel.

In a letter to the court dated January 8, 1987, the defendant stated:

> "I am writing this letter to inform you that I wish to have a Different Lawyer other than Mr. Reid present at my sentencing. For reasons I wish to use Mr. Reid in my appeal. Also, I believe I have reasons for a misstrail [*sic*]. So therefore Mr. Reid cannot help me any further. Thank you.
>
> Earl D. Sperow"

On January 26, 1987, the defendant's case was called for post-trial proceedings. At that time, there was no mention of this letter by the court, defense attorney, the defendant, or the State's Attorney. The post-trial motion filed on behalf of the defendant by defense attorney did not include any allegations of ineffective assistance of counsel. Defendant made no specific comments to the court in this respect. Based on the motion presented and arguments made by counsel, the court denied the defendant's post-trial motion and proceeded to sentence the defendant.

We find the case of *People v. Lewis* (1988), 165 Ill. App. 3d 97, 518 N.E.2d 741, dispositive of this issue. In *Lewis*, the defendant filed a letter with the court claiming that he had not been properly defended during trial. The written post-trial motion filed did not contain any allegation of ineffective assistance of counsel. At the hearing on defendant's post-trial motion, the defendant was present and nothing was said regarding his letters to the court or any claim of ineffective assistance of counsel. The *Lewis* court concluded that since the defendant did not make specific written allegations, did not pursue the matter contained in his letter, and did not properly apprise the court of any alleged ineffective assistance of counsel he thereby waived the issue for purposes of appeal. Additionally, the *Lewis* court concluded that the defendant's letters which were mailed to the court could not properly be regarded as a motion or request for substitute counsel because the defendant failed to properly present the matter to the court.

As further noted by the court in *Lewis*, the circumstances of the case were quite dissimilar from those of *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, and *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466. In both *Krankel* and *Jackson*, the trial

court was specifically apprised of defendant's allegations of ineffective assistance of counsel and the court specifically addressed the matter prior to denying substitute counsel.

As in *Lewis*, the defendant herein failed to make specific written allegations of ineffective assistance of counsel and did not raise the issue before the court during hearing on his post-trial motion. Defendant's failure to pursue his allegations render the matter waived.

■ The defendant next argues that the trial court erred in sentencing by considering that the defendant's conduct caused serious harm to the victim as a statutory factor in aggravation. Prior to imposing sentence, the court first noted there were no applicable statutory factors in mitigation. With respect to factors in aggravation, the court found the defendant's conduct to have caused serious harm, specifically stating:

"[T]he acts of the defendant in this case were accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. One does not need the words of Webster's dictionary to recognize brutal or heinous behavior. The mere recitation of the acts in this case accompanied by the pictures which were received in evidence of the defendant—I'm sorry, the victim, after her face and her skull were brutally pounded into the ground by a 24 pound block of concrete are acts that this court in all of its experience has seldom seen and are of such a nature that I can only define them as exceptionally brutal or heinous indicative of wanton cruelty, ***.''

The State initially argues that this argument has been waived for purposes of appeal. The failure of the defendant to object during sentencing or in his post-trial motion does render the issue waived. (*People v. Montague* (1986), 149 Ill. App. 3d 332, 346-47, 500 N.E.2d 592, 601.) Moreover, the defendant's argument fails on the merits.

In *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, our supreme court deemed that while it is impermissible for the trial court to consider the end result of a defendant's action in causing serious harm or death as a statutory factor in aggravation, it is permissible for the court to look to the specific circumstances of the case at hand. Specifically, the trial court may consider the amount and type of force employed and the physical manner in which the victim's death was brought about as a factor in aggravation. *Saldivar*, 113 Ill. 2d at 270, 497 N.E.2d at 1144; *Montague*, 149 Ill. App. 3d at 347, 500 N.E.2d at 601.

The conduct of the defendant herein was clearly reprehensible. The trial court clearly confined its consideration to the amount and type of

force employed. After reviewing the evidence presented by the record before us, specifically the manner in which the death occurred, we conclude that the court did not abuse its discretion in sentencing.

■ Finally, the defendant claims his conviction for unlawful restraint must be reversed as any restraint which occurred was incidental to his primary criminal purpose. Since the defendant's overriding intent was other than detention, he maintains the conviction cannot stand.

Again, the State asserts waiver of this issue. We note that the defendant's failure to object during trial and in post-trial proceedings renders the issue waived. (See *People v. Webb* (1986), 143 Ill. App. 3d 427, 432-33, 493 N.E.2d 52, 56.) Notwithstanding waiver, the defendant's argument also fails on the merits.

In *People v. Kuykendall* (1982), 108 Ill. App. 3d 708, 439 N.E.2d 521, this court established that a conviction for unlawful restraint requires proof of a separate intent to detain an individual. This knowing intent to detain cannot be derived from or incidental to the intent to commit another criminal act. This requirement of a separate intent to detain does not eliminate the possibility of a conviction of unlawful restraint as well as another offense. (*Kuykendall*, 108 Ill. App. 3d 708, 439 N.E.2d 521.) The evidence must, however, show that the restraint was independent of the other offense and punishable as such. *Kuykendall*, 108 Ill. App. 3d at 711, 439 N.E.2d at 523.

The evidence herein established that the defendant and Watts took Robinson to a deserted area knowing they had no money to pay for her services. The defendant pulled a knife on Robinson while in the car and made various threats to her. The defendant later instructed Watts to stop Robinson as she attempted to escape from the defendant following the stabbing. These acts are sufficient to show a separate intent to detain the victim. (See *People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089 (defendant's conviction for unlawful restraint was not barred by attempt (murder) conviction where conduct of sitting atop victim prior to stabbing was a separate and distinct act).) The trial court did not err in entering judgment on defendant's conviction for unlawful restraint.

Based on the foregoing, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

KNECHT and SPITZ, JJ., concur.