THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE LEE BAILEY, Defendant-Appellant.

Second District    No. 83—1042

Opinion filed April 9, 1985.

G. Joseph Weller, Paul J. Glaser, John R. Wimmer, and Marguerite S. Klimkowski, all of State Appellate Defender's Office, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Judith M. Pietrucha, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The circuit court of Kane County found the defendant, Willie Lee Bailey, guilty of the offense of theft over $300 (Ill. Rev. Stat. 1983, ch. 38, par. 16—1(a)(1)) and sentenced him to five years' imprisonment. The defendant appeals and raises two assignments of error in this court: (1) that the State failed to prove him guilty of theft over $300 beyond a reasonable doubt; and (2) that he was denied due process of law because the prosecutor improperly interfered with a codefendant's decision of whether to testify on the defendant's behalf.

Two codefendants, Allen Woods and Joseph Burton, were charged with the same offense. Woods entered a negotiated guilty plea and was sentenced to a 3½-year term of imprisonment. Burton and Bailey waived trial by jury, and their cases were tried by the court. The court entered a directed finding as to Burton and found Bailey guilty.

At trial, the State presented the testimony of three witnesses: Thomas Lester, who was handling the sales floor for Radio Shack on the date in question, Robert Trammell, the manager who was working at his desk at the back of the store, and Danny Pittman, an Aurora police officer.

Lester testified that on the date in question there was a Model 100 portable computer and a Minisette 9-cassette recorder displayed in a briefcase on a podium near the center of the store. The items were displayed in a briefcase because "[t]he whole concept of that particular model is it's a portable computer, they can carry it to work in a briefcase." The retail price of the computer and the recorder on that date was $799 and $69.95, respectively.

At about 2:20 p.m., a man later identified as Allen Woods entered the store. Lester approached him and asked if he could be of any assistance. No other customers were present in the store. Lester described this man as around 6 feet tall and very slender. He was wearing a maroon shirt, and he had a green jacket draped over his shoulder like a shawl. The man asked Lester some questions. The man pointed at some small computers and asked if they were calculators. Lester replied that they were small compact computers. Lester talked with the man for about a minute.

About half-way through his conversation with Woods, a second man, subsequently identified as Bailey, entered the store. He wandered over to Lester and Woods at first and then headed toward the back of the store.

Lester testified that, after his discussion with Woods, Bailey told Lester that he owned a video recorder and had had a plug break off in one of the jacks on the front of the unit. He wanted to know how it

could be fixed. Lester testified that he looked up and glanced over to see where Woods was, and he was right in front of the briefcase display on the podium. Lester subsequently testified that he could not see the display from where he had his conversation with Bailey because of a partition. Lester testified that Bailey asked him some other questions that he could not remember. At some point, Lester told Bailey that that particular store did not really handle the video recorders. During this conversation Lester saw Woods leaving the store. After Woods left, the conversation between Lester and Bailey lasted a "[m]atter of minutes. Wasn't very long at all." Bailey then left the store. He did not stop to look at other merchandise on the way out.

Lester looked at the briefcase and noticed that the small computer was gone. Lester went out the door. Bailey was still right outside the door, and Woods was out in the parking lot, heading toward a silver, four-door, later model Pontiac or Oldsmobile. Someone else was sitting in the driver's seat of the car. Lester had a side view of Woods, whose coat was still around his shoulders.

Lester accosted Bailey and said, "[H]ey, your friend just—you know, took a computer." On cross-examination, Lester stated that Bailey replied, "I don't know what's going on." Bailey then headed toward the car. Lester did not see Woods or Bailey get into the car. He ran inside the store and told Trammell, the manager, what had occurred.

Trammell took off out the door and Lester followed him. Trammell ran over behind the car, which was starting to back out, and yelled to Lester the license plate number. Lester wrote it down.

The car then left the parking lot, turning onto Lake Street. Lester stated that when the car turned onto Lake Street, "they put a little bit of power to it, they got on it," although previously there had been no "undue haste."

Lester called the police and provided them with, among other things, the license plate number and a description of the car. About 20 to 30 minutes later the police arrived at Radio Shack. They brought a tape recorder and a computer which Lester recognized as the missing items. Lester was called upon to view three black men in a police van, and he recognized the two who had been in the store, mainly by what they were wearing.

Lester stated that, when they were in the store, there was no conversation between Woods and Bailey. During Lester's conversation with him, Bailey spoke in a normal voice. When Lester was asked whether Bailey physically prevented him from going anywhere in the store, Lester replied, "Physically, no. I start to look up and he'd ask

another question." Bailey and Woods were in the store for a total of four or five minutes.

When Woods left, he did not run out of the store, but rather he took his time. Both Woods and Bailey walked away from the store. At that time, Bailey did not prevent Lester from running over to the car Woods was approaching. The following colloquy occurred:

"Q. [Mr. Janes, defense counsel] Would you say that he— could you say that Mr. Bailey didn't cooperate with you [in] any manner in trying to find out about this computer or cassette recorder?

A. [Mr. Lester] I would say he played dumb, like he didn't know what was going on.

Q. He didn't refuse to answer any questions to you about it, did he?

A. No.

Q. He didn't try to physically prevent you from doing anything physically about it?

A. No."

Lester testified that when he first saw the silver car, he could not tell whether the engine was running or not. There was nothing obstructing the view of the car's license plate.

On redirect examination, Lester stated that when he saw Woods walking away, he (Lester) was not able to see whether there was anything underneath Woods' coat.

The testimony of Robert Trammell, the manager of the store, was substantially similar to that of Lester with the following exceptions. Trammell stated that when Bailey was talking to Lester, he spoke loudly. Trammell also stated on direct examination that after Lester told Bailey that Woods had taken a computer, Bailey "took off running," although on cross-examination Trammell testified that he did not see Bailey after he left the store and before he got into the car.

Officer Pittman testified on direct examination that he was on patrol on the date in question in a marked squad car. He received a radio dispatch about the theft from Radio Shack at 2:33 p.m. About a minute later and eight blocks from the store, he encountered a grey, four-door Oldsmobile 98 going in the direction opposite to him. There were three men inside, and the license number matched the one given on the dispatch. Pittman made a U-turn and followed the car for about a mile, where he stopped it.

Pittman approached the front door on the driver's side. As he was obtaining identification from the driver, he saw the man on the rear seat (Woods) bend down and open his car door. Pittman then heard

something being dropped outside the car. Pittman then recovered the stolen property from underneath the car directly under the rear passenger door.

Pittman then arrested the three occupants of the car. He identified Burton as the driver and Bailey as the passenger in the front seat. The three men were loaded into a van and transported back to the Radio Shack store along with the stolen merchandise. Pittman then recounted Lester's identification of Bailey, Woods, the computer, and recorder.

Following Pittman's testimony, the State rested. Arguments were then presented on the defendants' motions for directed findings at the close of the State's case. The motion on behalf of Bailey was denied, and that on behalf of Burton was granted. The attorney for Bailey then informed the court that he had no evidence to present, and brief closing arguments were presented. During the course of those arguments the following colloquy occurred:

"MR. JANES: *** The State's case has not proven my client guilty beyond a reasonable doubt. It has not included [sic] any reasonable hypothesis of innocence, and I would ask that there be a finding of not guilty.

MR. WECHTER [Assistant State's Attorney]: Your Honor, I haven't heard any reasonable hypothesis of innocence set forth in this case.

THE COURT: I can think of a lot of them. Well, I'll retract that statement and ask that it be stricken from the record. I think it was just inappropriate on my part to make that kind of comment."

Following further argument, the court found Bailey guilty.

The defendant's first contention is that the State failed to prove him guilty of theft over $300 beyond a reasonable doubt. Specifically, he claims that the trial court erred in finding him accountable for the theft because his behavior at the time of the incident was consistent with a reasonable hypothesis of innocence.

In order to demonstrate a defendant's legal accountability for an offense under section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c)), the State must establish beyond a reasonable doubt that the accused solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; that such participation occurred either before or during the perpetration of the crime; and that this participation was with the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 724-25, *cert.*

*denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) While mere presence at the scene of the crime is insufficient to establish legal accountability for the commission of the offense, a person may aid or abet without actively participating in the overt act. (*People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10; *People v. Pleshko* (1983), 120 Ill. App. 3d 864, 875; *People v. Grice* (1980), 87 Ill. App. 3d 718, 725, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) Words of agreement are not necessary to establish a common purpose to commit a crime, because a common design can be inferred from the circumstances surrounding the commission of the unlawful act. (*People v. Tate* (1976), 63 Ill. 2d 105, 109; *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10-12; *People v. Bolla* (1983), 114 Ill. App. 3d 442, 447-48.) However, proof that a defendant was present during the commission of a crime without opposing or disapproving it, later maintained a close affiliation with his or her companions, and failed to report the crime are factors which a court may consider in determining a defendant's legal accountability. *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 11; *People v. Grice* (1980), 87 Ill. App. 3d 718, 725, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714 (and cases cited therein).

■ Where a defendant is convicted under the theory of legal accountability based upon solely circumstantial evidence, the facts proved must be consistent with the accused's guilt, but inconsistent with any reasonable hypothesis of innocence. (*People v. Wright* (1976), 43 Ill. App. 3d 458, 460; *People v. Grice* (1980), 87 Ill. App. 3d 718, 725, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) However, the trier of fact is not required to search out various potential explanations compatible with innocence and raise them to the status of a reasonable doubt. (*People v. Harris* (1975), 34 Ill. App. 3d 906, 908, *cert. denied* (1976), 429 U.S. 1002, 50 L. Ed. 2d 614, 97 S. Ct. 534; *People v. Grice* (1980), 87 Ill. App. 3d 718, 726, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) The trial court's conclusion that a defendant is legally accountable for the criminal conduct of another will not be set aside on review unless the evidence is so improbable, unsatisfactory or unreasonable that a reasonable doubt of the defendant's guilt exists. *People v. Tate* (1976), 63 Ill. 2d 105, 108; *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 11; *People v. Bolla* (1983), 114 Ill. App. 3d 442, 448; *People v. Grice* (1980), 87 Ill. App. 3d 718, 726, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.

■ As the parties do not dispute the facts in the present case, the controversy surrounds the inferences to be drawn from the facts.

The State claims that there are sufficient facts from which the trial court could have inferred that the defendant was acting in concert with Woods. The defendant contends, however, that the evidence against him was only circumstantial and did not exclude the possibility that he was only an innocent bystander. After reviewing the evidence, we conclude that the trial judge's determination that the defendant was legally accountable for the theft was clearly justified.

The defendant and Woods entered the Radio Shack store at approximately the same time. Woods went to the podium at the front of the store where the computer and cassette player were located. The defendant engaged the only salesman in a conversation at the rear of the store. The defendant questioned him about video recorders and the salesman informed him that the store sold only computers and software. Each time the salesman looked up, the defendant would ask him another question.

Meanwhile, Woods took the small, briefcase-sized computer and exited the store. After Woods left, the defendant abruptly ended his conversation with the salesman and exited the store without further browsing, additional questions or purchase. Noticing that the computer was missing, the salesman approached the defendant outside the store and told him that his friend took a computer. The defendant denied any knowledge and proceeded to follow Woods toward the car containing codefendant Burton, the driver, which immediately departed.

Clearly, these actions support the inference that the defendant and Woods were engaged in a common scheme to steal property from the store. Conversely, there is insufficient evidence in the record that the defendant established a reasonable hypothesis of innocent behavior. Therefore, the trial judge could have reasonably concluded, based on inferences from the defendant's conduct, specifically his conduct inside the store, his abrupt flight from the store and his departure with the individual who physically removed the property, that the defendant aided, agreed, or attempted to aid in the commission of the theft, and was not merely an innocent bystander.

■■ Finally, the defendant requests that this court focus on the trial court's remark made during argument. The prosecutor stated that he had not heard "any reasonable hypothesis of innocence," and the trial judge replied, "I can think of a lot of them." The judge immediately retracted that statement, stating, "I think it was just inappropriate on my part to make that kind of comment." The defendant relies on People v. Warren (1976), 40 Ill. App. 3d 1008, where a conviction of possession of marijuana, following a bench trial, was re-

versed on the basis that after closing arguments and prior to finding the defendant guilty, the trial judge, in a colloquy with the prosecutor and defense counsel, expressed doubts as to the defendant's guilt. We believe the facts of *Warren* are distinguishable in that there the court indicated continuous and repeated doubts as to the defendant's guilt. In the case at hand, the judge's offhand statement was immediately retracted. We do not believe the remark indicated the continuous doubt of the defendant's guilt that was deemed present in the *Warren* case.

■ The defendant's second contention is that he was denied due process of law because the prosecutor improperly interfered with a co-defendant's decision of whether to testify on the defendant's behalf. The State correctly notes, however, that the defendant did not raise this contention in his post-trial motion.

Generally, the failure to raise specifically a claim of error in a post-trial motion constitutes a waiver which precludes the reviewing court from considering that issue on appeal. (Ill. Rev. Stat. 1983, ch. 38, par. 116—1; *People v. Lucas* (1981), 88 Ill. 2d 245, 250; *People v. Baynes* (1981), 88 Ill. 2d 225, 230; *People v. Jackson* (1981), 84 Ill. 2d 350, 358-59; *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 181; *People v. Carlson* (1980), 79 Ill. 2d 564, 576.) It is not sufficient for a defendant to object to an alleged error during the trial to preserve it for review. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 189, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140; *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 181; *People v. Brown* (1981), 100 Ill. App. 3d 57, 73; *People v. Andino* (1981), 99 Ill. App. 3d 952, 954-55; *People v. Pallardy* (1981), 93 Ill. App. 3d 725, 730.) Since the defendant in the present case did not specifically raise this matter in his post-trial motion, it may be deemed waived.

However, Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)) provides a limited exception to the general rule of waiver. Under Supreme Court Rule 615(a), the court of review may take notice of plain errors or defects affecting substantial rights which were not brought to the trial court's attention. (87 Ill. 2d R. 615(a); *People v. Jackson* (1981), 84 Ill. 2d 350, 359; *People v. Foster* (1979), 76 Ill. 2d 365, 380; *People v. Pugh* (1982), 106 Ill. App. 3d 901, 906; *People v. Thiel* (1981), 102 Ill. App. 3d 28, 30.) Thus, errors which have not been properly preserved for review may be considered under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)) in cases where the evidence is closely balanced or the error was of such magnitude that the accused was denied a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 251; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Pickett*

(1973), 54 Ill. 2d 280, 283; *People v. Pugh* (1982), 106 Ill. App. 3d 901, 906.

Generally, substantial governmental interference with a defense witness' free and unhampered choice to testify violates due process. (*United States v. Henricksen* (5th Cir. 1977), 564 F.2d 197; *United States v. Morrison* (3d Cir. 1976), 535 F.2d 223; *United States v. Thomas* (6th Cir. 1973), 488 F.2d 334; *People v. McKiness* (1982), 105 Ill. App. 3d 92.) The defendant contends that the prosecutor's conduct at the plea negotiation violated his right to call codefendant Woods as a witness. The State argues, however, that the defendant's right to due process was not violated because the plea agreement simply secured Woods' truthful testimony in exchange for a favorable negotiated sentence.

At the time of Woods' plea negotiation, a dispute arose as to the terms of the initial plea agreement entered into by the parties. The prosecutor claimed that the plea agreement was contingent upon Woods' agreeing not to testify later at his codefendant's trial. The defendant contended, however, that that was not a term of the agreement and that Woods would be reluctant to testify at his codefendant's trial if he would be penalized by the State with respect to his own sentence. After much discussion, the prosecutor stated that the following plea agreement was reached:

"Three and a half years in the Department of Corrections for a plea to a Class 3 felony theft, Defendant [Woods] will be placed under oath, he'll swear to the facts as I state them on the record as to what the proof will be, and that includes he will swear that his co-defendants Bailey and Burton were involved with him in a common scheme or plan to commit this offense."

In *People v. McKiness* (1982), 105 Ill. App. 3d 92, the defendant contended that the prosecutor's threats to the defendant's brother caused the brother not to testify, thus depriving the defendant of his due process rights constitutionally guaranteed. In that case, the prosecutor stated that if the defendant's brother testified in the defendant's behalf, the prosecutor would guarantee the brother would go to jail and the prosecutor would go to trial on all charges pending against the witness. We found that the prosecutor's comments were improper and calculated to intimidate the witness and prevent him from testifying. The case at hand is clearly distinguishable from *McKiness*.

This agreement clearly did not require Woods to agree not to testify in any matter regarding his codefendants. There was no provision

that the agreement would be void and that he would be tried if he did testify at their trial. In fact, at the request of the defendant's attorney, the trial judge ordered that Woods be held in Kane County during the subsequent bench trial in case the defendant wanted to call him as a witness. Therefore, it is our opinion that the defendant in the present case was not denied a fair trial because of the plea negotiation and agreement entered into between the prosecutor and codefendant Woods.

For the reasons set forth above, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

REINHARD and STROUSE, JJ., concur.