THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WARREN LOVELADY, Defendant-Appellant.

First District (4th Division)   No. 1—88—1648

Opinion filed October 24, 1991.

Randolph N. Stone, Public Defender, of Chicago (Judy I. Mitchell-Davis
and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Sharon L. Heath, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Warren Lovelady, was convicted of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)), based on accountability, following a jury trial in the circuit court of Cook County. The trial judge sentenced defendant to 24 years in the penitentiary.

Defendant appeals, contending: (1) the trial court erred by denying his petition for severance, (2) the State used its peremptory challenges during *voir dire* to exclude black venirepersons from the jury, and (3) the State failed to prove his guilt beyond a reasonable doubt.

We affirm the judgment of the trial court.

BACKGROUND

On July 28, 1987, defendant and Keith Harris were jointly indicted on two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)) and one count of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2). On November 6, 1987, defendant petitioned the trial court to sever his trial from that of Harris. At a November 11 pretrial hearing, the trial judge granted the motion. However, at a subsequent pretrial hearing, on April 4, 1988, the trial judge reversed his ruling and denied defendant's petition for severance.

Defendant exercised his right to trial by jury; Harris waived the right. Thus, although defendant and Harris were tried jointly, defendant was tried before a jury, while Harris was tried before the bench. We further note that defendant and Harris separately appealed from their convictions, and that the trial transcript was filed in Harris' appeal. See *People v. Harris* (1st Dist. 1991), No. 1—88—2672 (Rule 23 order).

On April 4, 1988, at the close of *voir dire*, defendant moved for a mistrial. Defendant argued that the State used its peremptory challenges to exclude black venirepersons from the jury. (See *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) The trial judge denied the motion.

We have previously recited the evidence adduced at trial in our Rule 23 order (134 Ill. 2d R. 23) in Harris' appeal. (*Harris*, No. 1—88—2672.) However, since defendant claims that he was not proved

guilty beyond a reasonable doubt, we must describe the evidence, as it related to defendant, in detail, referring to our previous order.

The following pertinent evidence was adduced at trial. Christopher Jones testified that he was one of Harris' brothers and a friend of defendant. On July 20, 1987, at approximately 1:30 a.m., Jones, with his mother and sister, was in front of his house at 8221 South Coles Avenue in Chicago. Harris and defendant drove up in Harris' automobile. Harris asked Jones to help him change the oil in his car. Jones entered the car and sat behind Harris, who was driving. Defendant was in the front passenger's seat.

As they turned into the alley where his mother's garage was located, Jones saw the victim and a woman, Olga Gil, standing in a parking lot on the driver's side of the car. The victim was wearing a tee shirt and shorts with a towel around his neck. Earlier that evening, Jones' younger brother, Corey, and a friend had been chased and threatened by some "Mexican boys." The police were called, but no one was apprehended. Jones told Harris that the victim was one of the persons who had harassed Corey. Harris stopped the car and asked the victim if he had a problem. Defendant leaned toward Harris and said "here." Jones, however, was unable to see what defendant handed to Harris. Defendant then said "cap his ass." The victim pushed Olga Gil toward some garbage cans. Harris then pointed a gun out of the window and fired one shot. Jones did not see a weapon in the victim's hands. The victim ran into a nearby gangway.

Harris gave the gun back to defendant and began backing the car out of the alley. Defendant jumped out of the car, ran toward another car in the alley and pointed the gun toward the driver's side. The driver of the other car was Hugo Gil, Olga's brother. Hugo was another of the men who allegedly chased Corey earlier that evening. Defendant then ran away. Harris drove out of the alley and, a short time later, returned to Jones' house. Defendant, who was already there, said that the police were coming and that he was worried about being caught with the gun. Harris instructed Jones to hide it in the attic.

When the police arrived, Jones, Harris, and defendant stated that someone had shot at them. Later, at the police station, Jones admitted that he lied. He then accompanied the police to his house, where he retrieved the gun and gave it to an officer.

On cross-examination, Jones testified that he had never before seen Harris with a gun, and that they were not searching for the persons involved in the earlier incident with Corey. Jones identified the victim because his mother had instructed him to tell her if he saw the

men again so that she could alert the police. Jones did not tell investigators that Harris pointed the gun at the victim before firing it. Rather, Harris had simply leaned toward the passenger side and pulled the trigger. Jones was not certain whether the victim had a gun. Also, the car radio was on at the time of the shooting. As a result, although Jones thought defendant said "cap his ass," defendant might have said "pop his ass" or something else. Harris did not have a gun until immediately prior to the shooting. Jones did not believe that Harris intended to hurt anyone when he fired the shot.

Olga Gil testified that at approximately 1:30 a.m. on the night of the shooting, she, her brother Hugo, and the victim returned home from a neighborhood park. Hugo dropped her and the victim off on the corner and drove off to park the car in the garage behind their home. As she and the victim were crossing a parking lot, a car pulled up in the alley about 10 feet from them. At least two men were in the car, but she could not describe them except that they were black. One of the men asked the victim if he had a problem. The victim then stepped in front of Olga, placing himself between her and the car. He stretched out his arms and said "no problem." Suddenly, she heard a shot and saw gunfire coming from the front driver's side. The victim pushed her and told her to run. She ran toward some garbage cans and saw the victim run into a gangway next to the funeral home. She remained near the garbage cans for a few minutes, until she was certain that the car had left. She then searched for the victim and found him lying motionless in the gangway. As she was running home, she stopped a passing police car and reported the shooting.

Hugo Gil testified that as he was parking the car in the garage, he heard some screaming and then a gunshot. As he drove the car out of the garage, he saw another car going backwards down the alley. When the car reached the corner, a man carrying a gun jumped out of the passenger side and ran toward him. Hugo became frightened, ducked down and accelerated the car past both the man and the other car. When he looked in his rear view mirror and saw that the man still had the gun, he quickly drove away. When he arrived back home, the police were there.

Chicago police officer James Jackson testified that he received a radio report of shots fired on Coles Avenue. When he arrived there, he spoke to defendant, Harris, and Jones. Harris told Officer Jackson that while he was in the alley behind his house he was approached by three Hispanic men, one of whom fired a pistol at him. Defendant and Jones concurred in Harris' statement. As they were speaking, Officer Jackson received a report of a man having been shot in the area of

South Shore Drive. Officer Jackson went to that location and spoke with Olga Gil and the police officer already on the scene. Jackson then returned to Harris' house and took Harris, defendant, and Jones into custody for further questioning.

Chicago police detective Jack Wilkins testified that when he spoke to Jones at the police station, Jones recanted his story that they were shot at by Hispanic men. Jones also signed a search consent and accompanied Detective Wilkins back to his house where he retrieved the gun from the attic and gave it to Wilkins. Harris and defendant also retracted their earlier statements that they had been shot at in the alley. Defendant, Harris, and Jones each subsequently gave a statement to an assistant State's Attorney.

A ballistics expert testified that the gun, which Jones gave to Wilkins, was the instrument of death. Further, it was stipulated that the cause of death was a gunshot wound in the right side of the chest; that the body also had two gunshot wounds to the right arm, which were caused by a single bullet; and that the only way these wounds could have occurred was if the victim's arm was pressed closely across the chest.

Harris testified that immediately prior to the shooting, he arrived at his mother's house to visit with relatives from out of town. On the way there, he noticed that his car was smoking. He decided to change the oil before returning to his residence. Defendant and Jones got into the car. As Harris was driving around to his mother's garage in the alley, Jones informed him that their brother Corey had been chased by two men earlier that evening.

As they neared the garage, they saw a man standing with a woman in a parking lot. Jones informed Harris that the man was one of the men who had chased Corey. Harris stopped the car and asked the victim if they could talk. The victim asked Harris to identify himself. Harris responded that he was "the dude's brother you got into it with earlier." The victim asked, "what the f--- do you want?" Harris did not respond. The victim then "made a move like he was going for something." Harris thought that the victim was reaching for a gun. Harris ducked down and leaned toward the passenger side of the car. At that moment, defendant handed Harris a gun. Harris took the gun, reached up, and fired a shot out of the window. Harris' intention was only to scare the victim off, not to kill him. Harris then threw the gun on the seat and began backing out of the alley because he was scared. Defendant grabbed the gun and jumped out of the car.

On cross-examination, Harris stated that when the victim moved his arm across the front of his body, he thought the victim might have

been reaching for a gun from the left waist pocket of his shorts. However, Harris did not see any weapon. When defendant handed him the gun, defendant said something which might have been "pop his ass," but Harris was not certain. After the shooting, they returned to his mother's house. Defendant thought that the woman had been shot, so they agreed to hide defendant's gun before the police arrived. Harris testified that he signed the written statement prepared by the assistant State's Attorney even though it was not an entirely accurate account of what he had told her. Harris denied ever telling an assistant State's Attorney that defendant had said "pop his ass."

Defendant testified that he bought the gun used in the shooting two weeks earlier and that he carried the gun for protection. He had walked with his aunt to a bus stop just before stopping at Harris' house. Harris asked defendant to help him change the oil in Harris' car. When defendant got into Harris' car, Harris asked to borrow the gun because he was going to Cabrini-Green later that night and needed protection. Defendant gave the gun to Harris and told him that it held only one bullet. Harris placed the gun on the seat between them.

They drove around to the alley, where they saw the victim and a young woman on the driver's side of the car. Defendant heard Jones say "that's one of the guys," but he did not know what Jones meant. Harris stopped the car, lowered the radio volume, and asked the victim if he had a problem. The victim said something, but defendant did not hear what it was because he had raised the radio volume, faced forward, and did not pay attention to what was happening. Harris and the victim argued for a few minutes. When defendant next looked to his left, he saw the victim push the woman and saw Harris fire the gun. Harris then handed the gun to defendant. Harris instructed defendant to go to Harris' house, tell his mother that the man had shot at them, and to call the police.

Assistant State's Attorney Mary Lou Norwell testified for the State in rebuttal. She testified that she took the statements of defendant, Harris, and Jones. Further, Harris stated that when defendant handed him the gun, defendant stated "pop his ass."

On April 7, 1988, the jury convicted defendant of first degree murder. The trial judge subsequently denied defendant's post-trial motion. On May 18, 1988, at the close of the sentencing hearing, the trial judge found that the two murder counts merged into one. (See *People v. Hood* (1989), 191 Ill. App. 3d 129, 134, 547 N.E.2d 637, 641.) The trial judge sentenced defendant to a prison term of 24 years. Defendant appeals.

Opinion

## I

Defendant first claims that the trial judge erred by denying his petition to sever his trial from that of Harris. It is settled that defendants who are jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. *People v. Lee* (1981), 87 Ill. 2d 182, 187, 429 N.E.2d 461, 463.

A defendant may request severance by pretrial motion. (Ill. Rev. Stat. 1987, ch. 38, par. 114—8.) A defendant who requests severance carries the burden to prove, prior to trial, that a joint trial would be prejudicial. The defendant's motion must specifically detail his and his codefendant's defenses, the substance of the testimony to be heard at trial, and the manner in which the defenses conflict. (*People v. Cole* (1985), 131 Ill. App. 3d 36, 41, 475 N.E.2d 620, 624.) In ruling on the petition for severance, the trial judge essentially must predict the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings. *People v. Daugherty* (1984), 102 Ill. 2d 533, 541, 468 N.E.2d 969, 972-73.

The decision to grant a separate trial falls within the sound discretion of the trial court and will not be disturbed unless the court exceeded that discretion. Further, in reviewing the trial court's ruling on a petition for severance, this court must look only to the allegations in the petition itself and is not to consider the subsequent happenings during the course of the trial. *People v. Wolfe* (1986), 144 Ill. App. 3d 843, 849, 494 N.E.2d 670, 675.

## A

Generally, trial courts grant motions for severance based on two common forms of prejudice. Defendant raised both grounds in his petition and in argument on the petition. The first type of prejudice occurs when a codefendant has made hearsay admissions that implicate the defendant. The introduction of such statements into evidence can violate the defendant's sixth amendment right to confrontation if the codefendant's hearsay admission is admitted against defendant and he is unable to cross-examine the codefendant because the latter does not testify. *Daugherty*, 102 Ill. 2d at 541, 468 N.E.2d at 973; *People v. Lekas* (1987), 155 Ill. App. 3d 391, 402, 508 N.E.2d 221, 229.

In the case at bar, when the trial judge ruled on defendant's petition, the judge and all parties knew that Harris would testify at trial

and be subject to cross-examination. Further, the record shows that at trial, Harris denied ever telling Assistant State's Attorney Norwell that defendant said "pop his ass." Harris' statement came into trial via Norwell's rebuttal testimony for the State, to impeach Harris' testimony. "In such a situation, the sixth amendment right of confrontation is not implicated by admission of the out-of-court statement." *Lekas*, 155 Ill. App. 3d at 404, 508 N.E.2d at 231; see *People v. Morris* (1979), 79 Ill. App. 3d 318, 326-27, 398 N.E.2d 38, 45.

## B

"A second type of prejudice occurs when defenses of the various defendants are so antagonistic that a severance is imperative to assure a fair trial." (*Daugherty*, 102 Ill. 2d at 542, 468 N.E.2d at 973.) Actual hostility is required for defenses to be considered antagonistic. There must be a true conflict, such that each defendant professes his own innocence and condemns the other. *People v. Adams* (1988), 176 Ill. App. 3d 197, 200, 530 N.E.2d 1155, 1157.

■ Applying these principles to the case at bar, we conclude that defendant failed to show that Harris' defense was antagonistic to his. Defendant's defense essentially was that he was merely present at the scene of the crime and no more. He gave the gun to Harris prior to seeing the victim with a motive other than shooting the victim. His statement was exculpatory; it was a denial of involvement in the shooting.

The record shows that prior to trial, defendant did not produce any facts to show that Harris would accuse defendant of the shooting. We note Harris' trial testimony merely to illustrate this conclusion. Harris testified that he fired the gun because he thought the victim was reaching for a gun. Harris' defense was an unreasonable belief in self-defense. Indeed, Harris denied telling Assistant State's Attorney Norwell that defendant said "pop his ass." Thus, Harris' defense did not condemn defendant, *i.e.*, attribute the commission of the shooting to him. See *Cole*, 131 Ill. App. 3d 36, 475 N.E.2d 624.

True, Harris' admission differed from defendant's statement in various details, such as the exact moment defendant gave Harris the gun. However, at the most, Harris' admission was merely contradictory of defendant's defense rather than antagonistic to it. (See *People v. Rosario* (1989), 180 Ill. App. 3d 977, 981-82, 536 N.E.2d 756, 759.) The "mere contradiction in testimony of two defendants as to what happened on the day of the crime does not render defenses sufficiently antagonistic to constitute reversible error." (*Lekas*, 155 Ill. App. 3d at 408, 508 N.E.2d at 233.) We cannot say that the trial

judge exceeded his discretion in denying defendant's petition for severance.

## II

Defendant next claims that the State used its peremptory challenges during *voir dire* to exclude black venirepersons from the jury. In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the United States Supreme Court prescribed the elements of a *prima facie* case of purposeful discrimination during *voir dire*, based solely on the evidence of the prosecutor's misuse of peremptory challenges at that particular trial.

To establish a *Batson prima facie* case, the *Batson* Court held that a defendant must show that he is a member of a cognizable racial group; show that the State exercised its peremptory challenges to remove members of that group; and show other relevant circumstances that raise an inference that the prosecutor used the peremptory challenges to exclude venirepersons from the jury on racial grounds. (*People v. Baisten* (1990), 203 Ill. App. 3d 64, 73-74, 560 N.E.2d 1060, 1066, quoting *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.) Further, the Court has recently held that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Powers v. Ohio* (1991), 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366.

It is settled that a *Batson prima facie* case cannot be established merely by the numbers of black venirepersons stricken by the prosecution. Rather, the issue is whether this fact, in addition to "any other relevant circumstances," raises an inference that the prosecutor conducted purposeful discrimination. *People v. Holman* (1989), 132 Ill. 2d 128, 172-73, 547 N.E.2d 124, 142-43 (and cases cited therein).

"Relevant circumstances" include a pattern of strikes against black venirepersons; the prosecutor's questions and statements during *voir dire* and in exercising his challenges; whether there has been a disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire as compared to the jury; the race of the defendant and the victim; and the race of the witnesses. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172, 1184; *Baisten*, 203 Ill. App. 3d at 74-75, 560 N.E.2d at 1066.) Additionally, a trial judge's determination that a defendant failed to establish a *prima facie Batson* case will not be overturned unless it is against the manifest weight of the evidence.

*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 323, 559 N.E.2d 948, 953, citing *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184.

Defendant raised the *Batson* issue at the close of *voir dire*. The record shows that African-Americans constituted 16.6% of the venire. The prosecutor exercised five of the seven peremptory challenges that the State was allowed. Of the five venirepersons excluded by the State, the record identifies three who were African-American. The record further identifies two African-Americans whom the State accepted as jurors, constituting 16.6% of the jury. The trial judge essentially ruled that defendant did not establish a *Batson prima facie* case. However, after making this ruling, the trial judge compelled the prosecutor, over his objection, to give race-neutral reasons for his exercise of peremptory challenges. After hearing the prosecutor's explanation, the trial judge denied defendant's motion for mistrial.

The United States Supreme Court has recently held that it is of no concern when a trial court collapses *Batson's* procedural steps. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." (Emphasis added.) (*Hernandez v. New York* (1991), 500 U.S. 352, ____, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.) Since the prosecutor in the case at bar submitted an explanation for his exercise of peremptory challenges, the question of whether defendant established a *Batson prima facie* case is moot. Consequently, we turn to the question of whether the prosecutor's explanation was race-neutral. See *People v. Johnson* (1991), 218 Ill. App. 3d 967, 978-79.

Once the defendant establishes a *Batson prima facie* case, the burden shifts to the prosecutor to explain its use of peremptory challenges. The explanation must be clear, legitimate, trial-specific, and race-neutral to dispel the presumption created by the *prima facie* case. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24.) The prosecutor must show more than an intuitive judgment that black jurors will favor black defendants. However, the explanation need not rise to the level that justifies a challenge for cause. *Baisten*, 203 Ill. App. 3d at 77, 560 N.E.2d at 1068; *Batchelor*, 202 Ill. App. 3d at 323, 559 N.E.2d at 953; *People v. Jones* (1990), 201 Ill. App. 3d 440, 445-46, 559 N.E.2d 112, 116.

Examples of race-neutral explanations include but are not limited to: courtroom demeanor, employment status and type of job, connections with those who do criminal defense work, social relationships with lawyers and judges, age, status as renter or homeowner, arrest

record, if the venireperson lives near the scene of the crime, and if the venireperson has children of an age similar to the defendant. (*Baisten*, 203 Ill. App. 3d at 79-81, 560 N.E.2d at 1069-71; *Batchelor*, 202 Ill. App. 3d at 323, 559 N.E.2d at 953; *Jones*, 201 Ill. App. 3d at 447, 559 N.E.2d at 117.) A prosecutor's use of one of these traits to exclude black venirepersons is not race-neutral if the State retains white venirepersons having that same trait and there is nothing else that distinguishes the retained white venirepersons from the excluded black venirepersons. However, a peremptory challenge is usually based on a combination of traits. Thus, a particular trait that might justify exclusion of one venireperson might be acceptable in another who has a different combination of traits. *Batchelor*, 202 Ill. App. 3d at 323, 559 N.E.2d at 953.

Further, the disproportionate impact of the prosecutor's explanation on minority venirepersons is relevant to the ultimate issue of purposeful discrimination. However, this factor is not conclusive in determining whether the prosecutor's explanation is race-neutral. Rather, disproportionate *intent* is the key in evaluating the race-neutrality of the prosecutor's explanation. (*Johnson*, 218 Ill. App. 3d at 980-81, explaining *Hernandez*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.) After the prosecutor gives the explanation, the defendant then has the opportunity to rebut the explanation as pretextual. *Jones*, 201 Ill. App. 3d at 446, 559 N.E.2d at 116.

At the conclusion of the *Batson* hearing, the trial judge weighs the evidence in light of the defendant's *prima facie* case, the prosecutor's race-neutral explanation, and any defense rebuttal. The judge must determine the ultimate question of whether purposeful discrimination has been shown by a preponderance of the evidence. *Jones*, 201 Ill. App. 3d at 446, 559 N.E.2d at 116.

The trial court's *Batson* determination is a question of fact, based largely on credibility; thus, the decision is entitled to great deference. As a result, a trial court's *Batson* determination will not be disturbed on review unless it is against the manifest weight of the evidence. *Baisten*, 203 Ill. App. 3d at 77, 560 N.E.2d at 1068; *Batchelor*, 202 Ill. App. 3d at 323, 559 N.E.2d at 953; *Jones*, 201 Ill. App. 3d at 446-47, 559 N.E.2d at 116-17.

■ Applying these principles to the case at bar, we conclude that the evidence failed to establish a *Batson* case of purposeful discrimination. The record identifies three black venirepersons whom the State excluded from the jury: Annie Davis, Linda Christian, and Ronald Reid. Defendant asserts that the State also wrongfully excluded Sheila Travillion from the jury. However, the record does not

identify this venireperson's race. Thus, defendant's objection to this venireperson's removal is waived. See *People v. Evans* (1988), 125 Ill. 2d 50, 62, 530 N.E.2d 1360, 1364.

The prosecutor explained that Annie Davis was excused because she had a medical condition that caused her to fall asleep if she sat for extended periods of time; her husband was unemployed; and her youngest child, a son who was approximately defendant's age, was also unemployed. The prosecutor excused Linda Christian because she and her mother were each a victim of a crime that went unprosecuted and because Linda was a longtime teacher (see *People v. Harris* (1989), 129 Ill. 2d 123, 178-80, 544 N.E.2d 357, 381-82). Although the trial judge never required the State to explain the removal of Ronald Reid, the record shows that he was a student with a part-time job and that he did not own a residence, but rather, lived with his mother. Each of these traits is considered race-neutral. After carefully reviewing the entire record, we cannot say that the trial judge's denial of defendant's *Batson* motion was against the manifest weight of the evidence.

## III

Defendant lastly claims that the State failed to prove beyond a reasonable doubt his involvement in the crime. Defendant was convicted of murder based on accountability. A person is accountable for the conduct of another when either before or during the commission of an offense, with the intent to promote or facilitate its commission, he solicits, aids, or abets another in the planning or commission of that offense. (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) The State must prove each of these elements beyond a reasonable doubt. *People v. Bailey* (1985), 132 Ill. App. 3d 399, 403, 476 N.E.2d 1360, 1364; *People v. Grice* (1980), 87 Ill. App. 3d 718, 724-25, 410 N.E.2d 209, 215.

A person's mere presence at the scene of the crime is not culpable and is insufficient to establish legal accountability. Knowledge that a crime is being committed does not constitute aiding or abetting. However, one may aid or abet without actively participating in the overt act. Words of agreement are not necessary to establish a common purpose to perpetrate a crime; the common design can be inferred from the circumstances surrounding the commission of the unlawful act. Factors which the trier of fact may consider in determining a defendant's legal accountability include proof that the defendant was present during the commission of a crime without opposing or disapproving it, that he maintained a close affiliation with his companions after the perpetration of the offense, and that he failed to report the

crime. The trial court's finding that a defendant is legally accountable for the criminal conduct of another will not be set aside on review unless the evidence, when viewed in the light most favorable to the prosecution (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77), is so improbable or unsatisfactory that a reasonable doubt of the defendant's guilt exists. *Bailey*, 132 Ill. App. 3d at 404, 476 N.E.2d at 1364-65; *Grice*, 87 Ill. App. 3d at 725-26, 410 N.E.2d at 215-16.

Defendant argues that the testimony of Harris and of Jones failed to establish the elements of accountability. The testimony of an accomplice, corroborated or not, can be sufficient to sustain a conviction if the jury is convinced beyond a reasonable doubt. Although accomplice testimony is competent, it is often fraught with serious problems; it should be accepted with the utmost caution and subjected to the highest scrutiny. However, whether accomplice testimony forms a sufficient basis for conviction goes to the weight of the evidence. Thus, the determination of the issue is properly a function within the province of the jury. *People v. Page* (1987), 163 Ill. App. 3d 959, 968-69, 516 N.E.2d 1371, 1379.

■ Defendant points to alleged inconsistencies and discrepancies in the testimony of Harris and Jones. However, it is the function of the trier of fact to resolve any conflicts in the evidence and to assess the credibility of the witnesses. (*People v. Cadwallader* (1989), 181 Ill. App. 3d 488, 497-98, 536 N.E.2d 1319, 1325.) After carefully reviewing the entire record, we cannot say that the evidence was so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. See *People v. Cobb* (1981), 97 Ill. App. 3d 615, 617-18, 422 N.E.2d 1106, 1108-09.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.